639 F.2d 6
 11 Envtl. L. Rep. 20,091, 7 Media L. Rep. 1132
 JOHN DONNELLY & SONS, National Advertising Company, and
William S. Schaeffer, Plaintiffs, Appellants,
v.
George N. CAMPBELL, Jr., Commissioner of Transportation,
State of Maine, Defendant, Appellee.
 No. 79-1575.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 5, 1980.
Decided Dec. 22, 1980.
 
 Richard P. Holme, Denver, Colo., with whom Davis, Graham & Stubbs, Denver, Colo., Donald W. Perkins and Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Maine, were on brief, for plaintiffs, appellants.
 Cabanne Howard, Asst. Atty. Gen., Augusta, Maine, with whom Allan A. Toubman, Asst. Atty. Gen., and Thomas G. Reeves, Counsel, Dept. of Transp., Augusta, Maine, were on brief, for defendant, appellee.
 Before ALDRICH and BOWNES, Circuit Judges, PETTINE, District Judge.*
 ALDRICH, Senior Circuit Judge.
 
 
 1
 The question before us of the constitutionality of a Maine statute requires the assessment of a number of general societal values against their cost in First Amendment rights. The statute, 23 M.R.S.A. §§ 1901 et seq., is entitled the Maine Traveler Information Services Act, somewhat euphemistically,[1] since its principal purpose is to abolish billboards altogether and to reduce materially the number, size and content of all other signs viewable by travelers on any public way in the state.[2] The complainants are two corporations that erect signs, John Donnelly & Sons (billboards) and National Advertising Company (others), and one individual who wishes to read them.[3] Rejecting plaintiffs' claims that the statute impermissibly overrode First Amendment rights, the district court, with an extensive opinion, John Donnelly & Sons v. Mallar, 453 F.Supp. 1272, dismissed the action, and plaintiffs appeal.
 
 
 2
 The legislature in its preamble asserted three justifications for the statute's prohibitions: the protection of the state's landscape, a natural resource; the enhancement of the tourist industry, and the public interest in highway safety. To compensate for its restrictions on signs, the law provides for various informational services. The presently salient aspects include the following.
 
 
 3
 § 1902. Policy and purposes
 
 
 4
 To promote the public health, safety, economic development and other aspects of the general welfare, it is in the public interest to provide tourists and travelers with information and guidance concerning public accommodations, facilities, commercial services and other businesses, and points of scenic, cultural, historic, educational, recreational and religious interest. To provide this information and guidance, it is the policy of the State and the purpose of this chapter to:
 
 
 5
 1. Official information centers; signs. Establish and maintain official information centers and a system of official business directional signs;
 
 
 6
 2. Information publications. Provide official directories, guidebooks, maps and other tourist and traveler information publications;
 
 
 7
 3. Control outdoor advertising. Prohibit and control the indiscriminate use of outdoor advertising; and
 
 
 8
 4. Protection of scenic beauty. Enhance and protect the natural scenic beauty of the State.
 
 
 9
 § 1903. Definitions
 
 
 10
 14. Sign. "Sign" means any structure, display, logo, device or representation which is designed or used to advertise or call attention to any thing, person, business, activity or place and is visible from any public way. It does not include the flag, pennant or insignia of any nation, state or town. Whenever dimensions of a sign are specified they shall include frames.
 
 
 11
 § 1908. Regulation of outdoor advertising
 
 
 12
 No person may erect or maintain signs visible to the traveling public from a public way except as provided in this chapter.
 
 
 13
 We begin with a review of the governing principles.
 
 
 14
 "(A) direct and substantial limitation (on speech can) be sustained (if) it serves a sufficiently strong, subordinating interest that the Village is entitled to protect." Schaumburg v. Citizens for a Better Environment, 1980, 444 U.S. 620, 636, 100 S.Ct. 826, 836, 63 L.Ed.2d 73.
 
 
 15
 Time, place, and manner restrictions are permissible if
 
 
 16
 "they are justified without reference to the content of the regulated speech, ... they serve a significant governmental interest, and ... in so doing they leave open ample alternative channels for communication of the information." Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 1976, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346.
 
 
 17
 Like most one-liners, these are overly simplistic. In our case, they omit an important consideration: not only must the restrictions serve a "sufficiently strong" or "significant governmental interest," they must significantly serve that interest. Hence we must evaluate not only the importance of the state's interests, but also the extent to which the restrictions further those interests, viz., their reasonable relationship to the achievement of the governmental purpose." Bates v. Little Rock, 1960, 361 U.S. 516, 525, 80 S.Ct. 412, 417, 4 L.Ed.2d 480. Finally, in measuring the effect of the statute on free expression, the freedoms of the First Amendment must be kept "in a preferred position." Saia v. New York, 1948, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574, see Schneider v. State, 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155. In other words, the regulation must be no more restrictive than reasonably necessary to serve the governmental interest. Brown v. Glines, 1980, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540.
 
 
 18
 In sum, when First Amendment freedoms are on one side of the scale, the balance must be struck by the courts, not by the legislators.
 
 
 19
 "A legislature appropriately inquires into and may declare the reasons impelling legislative action but the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution. Were it otherwise, the scope of freedom of speech and of the press would be subject to legislative definition and the function of the First Amendment as a check on legislative power would be nullified." Landmark Communications, Inc. v. Virginia, 1978, 435 U.S. 829, 844, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1.
 
 
 20
 After determining that the statute is not impermissibly content-directed, the court must gauge the validity and strength of the state's interest, the extent to which the restrictions further it and the sufficiency of the alternative means or remaining channels of communication, and then determine whether, in their totality, the limitations imposed by the statute are justified. See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, 447 U.S. 557, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341; Baldwin v. Redwood City, 9 Cir., 1976, 540 F.2d 1360, 1365-68, cert. denied, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223; State v. Lotze, 1979, 92 Wash.2d 52, 593 P.2d 811, appeal dismissed, 444 U.S. 921, 100 S.Ct. 257, 62 L.Ed.2d 177; Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464, 466-68 (1969).
 
 
 21
 We are satisfied that the law, generally, is not directed to content. Billboards are banned not because of the messages they convey, but because the medium itself is objectionable. Metromedia, Inc. v. San Diego, 1980, 26 Cal.3d 848, 610 P.2d 407, 418, 164 Cal.Rptr. 510, prob. juris. noted, --- U.S. ----, 101 S.Ct. 265, 66 L.Ed.2d 127, 1980. Plaintiffs point to the fact that some of the exceptions to the statute's prohibitions do depend on the message conveyed,[4] and accordingly argue that the statute is content-oriented. The argument proves too much. Each of the exceptions reflects "an appropriate governmental interest." Police Department of Chicago v. Mosley, 1972, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212; see Carey v. Brown, 1980, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263. See also Gay Students Organization v. Bonner, 1 Cir., 1974, 509 F.2d 652, 660-62 and n.6; People Acting Through Community Effort v. Doorley, 1 Cir., 1972, 468 F.2d 1143, 1145; Karst, Equality as a Central Principle in the First Amendment, 43 U.Chi.L.Rev. 20 (1975). Some for signs of governmental and quasi-governmental bodies, and for traffic and bus signs and the like are justified by sheer public necessity. Others e. g., for signs showing the place and time of meetings, services and events of religious, civic and philanthropic and other public organizations, and, of course, for voter information for elections, primaries and referenda reflect the important governmental interest in dissemination of information of special public concern. These fall in the category of ideological speech[5] even though they may involve raising money to carry out the sponsoring group's primary functions, see Schaumburg v. Citizens, ante, 444 U.S. at 628-33, 100 S.Ct. at 831-834; Murdock v. Pennsylvania, 1943, 319 U.S. 105, 110-12, 63 S.Ct. 870, 873-74, 87 L.Ed. 1292; Jamison v. Texas, 1943, 318 U.S. 413, 416-17, 63 S.Ct. 669, 671-672, 87 L.Ed. 869, which is still accorded fuller rights under the First Amendment than commercial speech. Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, ante, 100 S.Ct. at 2349; Consolidated Edison Co. of New York v. Public Service Comm'n of New York, 1980, 447 U.S. 530, 538, 100 S.Ct. 2326, 2333 n. 5, 65 L.Ed.2d 319. This being said, it would ill behoove the courts to deny the legislature the power to make the same distinction. "Even within the area of protected speech, a difference in content may require a different governmental response." Young v. American Mini Theatres, Inc., 1976, 427 U.S. 50, 66, 96 S.Ct. 2440, 2450, 49 L.Ed.2d 310. In sum, we do not find that these exceptions change the statute from a time, place and manner restriction to one impermissibly based on content.
 
 
 22
 We must, however, charge some of the restrictions with being excessively content-related. To replace some of the multitude of size and styles of signs outlawed by the Act, provision is made for "official business directional signs" (OBDS), to be furnished by the applicant, but to be erected by the Commission of Transportation. Content, as well as size and style is strictly limited.[6] The state interests offered to support the act, post, may, within limits, justify maximum sizes and uniformity of style. We fail to see the necessity, however, of restricting OBDS content to "route and distance." (Section 1903, subsection 7). And, while overly large signs can well be objectionable, it seems extreme to set the size so small that there is no room for further information. To limit, for example, a motel having a large amount of luxury equipment to the same announcements as one with none, absent a compelling reason, is contrary to the philosophy of Virginia Bd. of Pharmacy, ante, both with respect to the owner of the sign, and the traveling public. Rather, it seems an over-emphasis on neatness. We do not at all suggest opening the door wide, but on the present record we believe it shut overtight.
 
 
 23
 The state's asserted justifications, as we have said, are three. With respect to highway safety, it correctly points out that many courts have found this a sufficient, or at least an important reason for banning billboards. Some consider only whether highway safety is a permissible basis for an exercise of the police power so as to avoid the requirement of compensation for a taking. E. g., E. B. Elliott Advertising Co. v. Metropolitan Dade County, 5 Cir., 1970, 425 F.2d 1141, 1151-52, cert. dismissed, 400 U.S. 805, 91 S.Ct. 12, 27 L.Ed.2d 35; Ghaster Properties, Inc. v. Preston, 1964, 176 Ohio St. 425, 200 N.E.2d 328, 335-37; General Outdoor Advertising Co. v. Department of Public Works, 1935, 289 Mass. 149, 180-84, 193 N.E. 799, 813-15, appeal dismissed, 297 U.S. 725, 56 S.Ct. 495, 80 L.Ed. 385. Others approve a legislative finding that the promotion of highway safety is sufficient to outweigh the burden upon speech. E. g., State v. Lotze, ante, 593 P.2d at 813-14; Metromedia, Inc. v. San Diego, ante, 610 P.2d at 416-20. But see State v. Pile, 1979, Okla., 603 P.2d 337, pet'n for cert. filed sub nom. Oklahoma v. Pile, No. 79-1617 (2/11/80), 48 U.S.L.W. 3699 (opinion by a divided court that there must be a "clear and present danger" to justify "dubious intrusions" on liberties.) Our difficulty is that these courts, as the state here, apparently consider the issue to be simply whether billboards can rationally be said to affect highway safety, reasoning that highway safety is a proper police power matter as to which the state interest is strong, and since billboards could affect highway safety, the legislative determination is to be respected. This approach disregards the question of the substantiality of the connection between the challenged measure and the state interests asserted to support it.
 
 
 24
 We agree that even under Landmark Communications, ante, once it is concluded that there is a rational connection between means and end, the legislative determination is entitled to weight. How much weight is another matter. This being a motion for summary judgment, plaintiffs' affidavits have presented an exceptionally strong array of uncontradicted recitals that billboards do not cause accidents. The state's response that these opinions, although based on studies backed by statistics, are not evidentiary, but merely conclusory, is not well taken. Not only is the record devoid of contrary evidence, see F.R.Civ.P. 56(e), but to the extent that we could take judicial notice from our own observations, we know of nothing to support the state's claim that there is no factual issue. Cf. Hirschkop v. Snead, 4 Cir., 1979, 594 F.2d 356, 373 (need for "empirical data" where efficacy of rule restricting freedom of speech is not clear.)
 
 
 25
 There is a further difficulty. The statute's condemnation is universal, regardless of the nature of the ways, of the extent of the unimpeded view, and of particular traffic conditions. In the interest of workable enforcement some overbreadth is permissible, but the disparity here seems far from minimal. Moreover, we can think of no reason to believe that the signs which the statute permits will be any less distracting than some of those that are prohibited. The contrary may well be supposed. Vehicular signs, permitted under the statute, have long been recognized as posing traffic safety problems. See Railway Express Agency, Inc. v. New York, 1949, 336 U.S. 106, 109, 69 S.Ct. 463, 465, 93 L.Ed. 533. Other types of signs are permitted because they are deemed particularly important, see n.4, ante; these, too, would seem particularly distracting. Finally, and significantly, on-premise signs seem far greater traffic hazards than signs conveying information for future use. One need hardly ask which is more likely to disturb the traffic pattern, a sign that advertises that some product or service is available ahead, or one that causes the passenger or driver to exclaim that the spot is just being passed.
 
 
 26
 The fact that the statute may retain some dangerous signs and leave some that are not is not determinative, but does diminish the overall importance, from the standpoint of safety, of the restrictions effected. Concededly the purpose of all signs is to attract attention, and it must be that they generally do so or plaintiffs could not operate. Moore v. Ward, Ky., 1964, 377 S.W.2d 881, 886. Nevertheless, it does not follow that the prohibited signs pose a significant threat to highway safety; the record before us strongly suggests the contrary. We hold on the present record that highway safety is not a sufficient ground, standing alone, to support so broad a statute, and we have doubts whether it is even a strong contributing factor.[7]
 
 
 27
 The far better justifications for the statute are the preservation of the state's natural beauty for all its inhabitants, and the consequent enhancement of one of its great economic resources, the tourist industry. Here, as distinguished from traffic safety, plaintiffs are inescapably faced with numbers the more signs, the worse the appearance. While a substantial number of billboards might well be left at selected locations without endangering highway safety, any appreciable number will injure the landscape. An aesthetic justification also fares better than highway safety from the standpoint of judicial notice. While we may feel unqualified on this record to declare the extent of the detrimental effect of billboards as a class upon highway safety, with respect to aesthetics their effect is obvious. One cannot review the billboard exhibits to plaintiffs' affidavits without a resurgence of unpleasant memories, nor can we doubt that the removal of billboards and large signs as provided for in the act would substantially benefit the state's attractive landscape.
 
 
 28
 The question, therefore, is not whether there is a substantial connection between the restriction and the interest intended to be protected, but only whether the interest is one entitled to protection, and whether it is strong enough to justify the act's restrictions on speech. As to the first, the law is clear. In Berman v. Parker, 1954, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27, the Court said,
 
 
 29
 "The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (Citation omitted).
 
 
 30
 The cases are almost uniform that there is a strong governmental interest in preserving the beauties of the landscape. E. g., Berman v. Parker, ante, 348 U.S. at 33, 75 S.Ct. at 102; Metromedia, ante, 592 P.2d at 735-36; Suffolk Outdoor Advertising Co. v. Hulse, 1977, 43 N.Y.2d 483, 402 N.Y.S.2d 368, 373 N.E.2d 263, appeal dismissed, 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101; John Donnelly & Sons, Inc. v. Outdoor Advertising Board, 1975, 369 Mass. 206, 216-24, 339 N.E.2d 709, 717-20; Markham Advertising Co. v. State, 1968, 73 Wash. 405, 439 P.2d 248, 259-60, appeal dismissed, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512; Cromwell v. Ferrier, 1967, 19 N.Y.2d 263, 225 N.E.2d 749; Ghaster Properties, ante, 200 N.E.2d at 336-37; General Outdoor Advertising, ante, 289 Mass. at 184-89, 193 N.E. at 815-17.
 
 
 31
 Hand in hand with aesthetics is tourism, one of Maine's important industries and a substantial economic resource. We would doubt whether the perennial visitor who has a summer residence would be deterred by the unpleasantness of the trip, but for those for whom the trip is the objective the number of whom is attested to by the quantity of motels, restaurants and roadside attractions it is a different story. "Because this state relies on its scenery to attract tourists and commerce, aesthetic considerations assume economic value." Metromedia, ante, 610 P.2d at 413; see also E. B. Elliott, ante, 425 F.2d at 1152; New Orleans v. Pergament, 1941, 198 La. 852, 5 So.2d 129, 131. It cannot be doubted that the legislature has the right to protect this industry, nor can we question, as we did with highway safety, the direct connection between signs, scenery, and tourism. Furthermore, particularly in the absence of any contrary showing the weighing of the pros and cons and determining the net benefits must be a legislative judgmental matter, and not a judicial one.
 
 
 32
 Concededly, not all members of the tourist industry are pleased by the statute. A small number have furnished support to the plaintiffs by way of affidavits. One is the president of the Maine Mid-Coast Route One Association, who wants no interference with signs on Route One, a principal highway. The others represent tourist attractions located off principal highways, primarily in the Boothbay area, a number of miles from Route One, who, again, want signs on the principal highways. With respect to establishments such as these which cannot be so well served by on-premise signs, we consider them candidates for section 1911(3), which liberalizes the restrictions on Official Business Directional Signs in cases of "unusual hardship due to conditions of topography, access or other physical characteristics." They will be further assisted if the legislature liberalizes the permissible content of official business directional signs. It will be time enough for off-route businesses to object if they can show specific, unallayed hardship. We will not invalidate an entire statute on the theory that they might not be heard, or on an unsupported inference that the legislature has flouted the wishes of the tourist industry as a whole.
 
 
 33
 As distinct from highway safety, then, the statute undoubtedly advances the related state interests in aesthetics and tourism. Nor do we agree with plaintiffs that the statute is not narrowly drawn to serve this purpose. It is true that all signs are not equally disfiguring, and that some locations, less attractive to start with, would suffer less than others. But even if one were to concede that some particular locations might be but little hurt by the presence of signs, the legislature could well feel that this overinclusiveness must be tolerated. Assuming the state's substantial interest in an aesthetic landscape, the question is whether there are any practical alternatives. One can easily imagine the problems involved in attempting to zone the entire state. Few will be satisfied. Urban dwellers, as well as country residents and travelers have an interest in the quality of their surroundings. Berman v. Parker, ante; John Donnelly & Sons, Inc. v. Outdoor Advertising Board, ante, 369 Mass. at 221-24, 339 N.E.2d at 719-20. Quite apart from the work, and expense, there would be substantial difficulties in the determination and application of standards, with the assurance that other plaintiffs, if not these, would be quick to sue. Moreover, to designate one area as, so to speak, second class, might not only inspire complaints, but would tend to impede improvement. On the other hand, as against general zoning, a commission that would decide on a piece-by-piece basis might well experience even greater difficulties.[8] In short, we feel the statute is as narrowly drawn as is practically and legally possible.
 
 
 34
 Nor are we moved by the suggestion that it diminishes the state's aesthetic position to allow on-premise signs while imposing greater restrictions on others. Apart from the necessity of making some commercial allowances, on-premise signs are the leastaesthetically offensive. The advertised structure, whether flea market, gas station, or restaurant, has already violated the landscape, and the act so limits permissible on-premise signs as to ensure that any further damage will be negligible.[9] From the point of view of aesthetics there is no unfair discrimination in disfavoring off-premise as against on-premise signs. Newman Signs, Inc. v. Hjelle, N.D., 1978, 268 N.W.2d 741, 758-59, appeal dismissed, 440 U.S. 901, 99 S.Ct. 1205, 59 L.Ed.2d 449. Similarly, the permitted signs on common carriers and motor vehicles, section 1913(1)(A), are of a more ephemeral nature; to outlaw them, moreover, would present difficult questions regarding interstate commerce. Compare Southern Pacific Co. v. Arizona, 1945, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915, with South Carolina State Hwy. Dep't v. Barnwell Bros., 1938, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734.
 
 
 35
 On the matter of alternative or remaining means we would divide commercial speech into two categories: general advertising for national brands, and specific advertising by individual purveyors of goods and services. Concededly there is some loss, as is always the case when the public interest conflicts with the private. For general advertising, however, we see no problem. While naturally plaintiffs, particularly the billboard plaintiff, tout the special qualities of roadside promotion, the dollar statistics and judicial notice both point to ample alternatives. For individual purveyors, besides permitted official business directional signs, the statute allows a substantial amount of on-premise notification. In addition, the statute provides for official tourist information centers, section 1905,[10] and for directories and guidebooks and other services, section 1907.[11] They are by no means cut off.
 
 
 36
 We may agree, in spite of all this, that for some persons the statute's curtailments may effect a noticeable diminution of opportunities. It is to be observed, however, that not only is commercial speech not entitled to full First Amendment protections, but deprivation of highway opportunities is not as legally objectionable as some other curtailments. The use of land adjoining the highway for commercial advertising is really use of the highway itself. New York Thruway Authority v. Ashley Motor Court, Inc., 1961, 10 N.Y.2d 151, 176 N.E.2d 566, 569. Highways are "created for a quite different purpose by the expenditure of public money ...." General Outdoor Advertising Co. v. Department of Public Works, ante, 289 Mass. at 169, 193 N.E. at 808. As such they are to be distinguished from parks or other facilities created for general use, and weight should be given to the state's right to restrict the state-created incidental benefits. Cf. Lehman v. Shaker Heights, 1974, 418 U.S. 298, 302-03, 94 S.Ct. 2714, 2716-17, 41 L.Ed.2d 770 (plurality opinion), 305-06 (Douglas, J., concurring in judgment). In sum, we believe the general tenor of the statute, so far as commercial advertising is concerned, is sufficiently supported by the public good.
 
 
 37
 Plaintiffs seek to distinguish the numerous cases upholding billboard laws by urging that only certain highways or municipalities were involved, and that none was a statewide ban on all billboards. The distinction is misleading. Many of these statutes banned billboards from the interstate and primary systems in the entire state. E. g., Stuckey's Stores, Inc. v. O'Cheskey, 1979, 93 N.M. 312, 600 P.2d 258, 446 U.S. 930, 100 S.Ct. 2145, 64 L.Ed.2d 783, appeal dismissed; State v. Lotze, ante; Newman Signs, Inc. v. Hjelle, ante; Modjeska Sign Studios, Inc. v. Berle, 1977, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 373 N.E.2d 255, appeal dismissed, 439 U.S. 809, 99 S.Ct. 66, 58 L.Ed.2d 101; Markham Advertising Co. v. State, ante; Ghaster Properties, Inc. v. Preston, ante. Since billboards are profitable only in terms of exposure, one does not see many of them on the secondary roads that concerned the majority in State v. Pile, ante. If plaintiffs lost use of the highways we cannot believe they could subsist on the byways; indeed, they say as much. What plaintiffs, and such tourist industries as support them, see ante, are really seeking is the principal highways, as to which the distinction they attempt to draw is irrelevant. Moreover, two of the cases they cite, Suffolk Outdoor Advertising Co. v. Hulse, ante, and Veterans of Foreign Wars v. Steamboat Springs, 1978, 195 Colo. 44, 575 P.2d 835, appeal dismissed, 439 U.S. 809, 99 S.Ct. 66, 58 L.Ed.2d 101, each sustained an ordinance banning all billboards in an entire town. The advertiser who seeks to reach that audience for example, a candidate for City Council or a local clothing store would probably see little difference between a total municipal and a statewide ban.
 
 
 38
 Plaintiffs complain of the enormity of legislation which would abolish their entire business, per se. Times change, and businesses with them. The iceman no longer cometh, the buggy-whip manufacturer has passed from the scene, and one could name countless enterprises that have failed because of a change in public demand or sentiment. Equally, public concern may overcome the economic interests of private individuals, and a state may wholly prohibit a heretofore lawful business and destroy an entire industry. Mugler v. Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205.[12] Nor do we know of any issue of degree; plaintiffs cannot ask the public interest to give way at some economic crossroad in their balance sheets. We note, moreover, that if we were to recognize an economic approach, it would go far beyond a complaint of total abolition. Plaintiffs are already arguing that they could not survive on political speech alone if only commercial speech were restricted. Even as to commercial speech they state that "in order to survive (their signs) must be capable of being located throughout a geographical area." Plaintiffs' economic argument is a novel approach to the First Amendment which we decline to adopt.
 
 
 39
 To summarize, where commercial speech is concerned we would have little reservation in holding that the statute directly serves legitimate state interests and (with the exception of the restrictions in the OBDS provision) that these interests could not be served as well by a more limited restriction on commercial speech. See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, ante, 100 S.Ct. at 2350. We note that "(t)he First Amendment's concern for commercial speech is based on the informational function of advertising." Id. For those commercial advertisers for whom signs are an essential medium, this function is adequately served by the OBDS provision (as liberalized, ante) and the on-premise exception; we have little doubt that these will be well utilized. See id. at 100 S.Ct. 2350 n.6.
 
 
 40
 There is more involved here, however, than commercial advertising. We take strong exception to the state's characterization of the statute's impact on noncommercial speech as "incidental" and "of no constitutional significance." The district court found that some 24% of the messages carried on Donnelly's billboards and 5% on those of National Advertising Company signs are noncommercial in nature. Manifestly the statute affects much ideological communication not accounted for in these figures; signs of all sorts a candidate's poster on a telephone pole; "Jesus Saves" painted on the side of a barn are within the statute's reach. A great deal of communication on topics of political, social, cultural, and religious import speech long afforded maximum protection under the First Amendment, see New York Times v. Sullivan, 1964, 376 U.S. 254, 269-70, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 is regulated or prohibited by the law before us.
 
 
 41
 True, the Maine scheme makes accommodation for some signs of this type. Signs showing the place and time of church services and meetings of civic organizations; signs announcing events of public, civic, philanthropic or religious organizations up to three weeks in advance; signs erected for an election, primary or referendum, again within three weeks of the event; and signs outside the right of way for historical or cultural organizations are all exempted. These exceptions, however, do not go far enough. Initially, we doubt that three weeks is enough time to publicize a campaign, particularly for the little-known or unpopular candidate, or cause, with the greatest need for exposure. Moreover, no exception is available for signs on important public issues as to which no referendum is pending. Messages such as "Abortion is Murder," "Save the Whales," "No Nukes," and "Contribute to your Community Fund" are altogether banned. Not even the exception for on-premise signs is available, since these must "advertise (a) business, facility or point of interest conducted thereon ...." Section 1903(8). The law thus impacts more heavily on ideological than on commercial speech a peculiar inversion of First Amendment values.
 
 
 42
 The statute not only provides greater restrictions and fewer alternatives, the other side of the coin for ideological than for commercial speech, but in one respect ideological speech seems more dependent upon outdoor advertising to begin with. The record shows that outdoor advertising, based upon cost per exposure, is a far less expensive means of communication than radio, television, newspaper or magazines. The district court's conclusion that the fact that only 1.2% of advertising expenditures go to outdoor advertising demonstrated the alternatives available for "commercial and noncommercial advertising alike," 453 F.Supp. at 1280 & n.10, seems to us a non sequitur.[13] Signs which can be cheaply erected particularly permit advancing "poorly financed causes of little people," Martin v. Struthers, 1943, 319 U.S. 141, 146, 63 S.Ct. 862, 864, 87 L.Ed. 1313, a prime First Amendment objective. In short, the statute's impositions are both legally and practically the most burdensome on ideological speech, where they should be the least.
 
 
 43
 We are obliged to hold the statute unconstitutional. No further hearings could materially assist. Reversed and remanded for an entry of judgment in favor of plaintiffs.
 
 
 44
 PETTINE, District Judge, concurring in the judgment.
 
 
 45
 I concur in the judgment of the court that the Maine Traveler Information Services Act unconstitutionally abridges First Amendment rights. The statute presents several difficult questions, and I am in accord with the court's view on many of them. I write separately, however, because I am compelled to disagree with the implications of the court's treatment of commercial speech.
 
 I. The Nature of the Statute
 
 46
 At the outset, I note the difficulty of placing the Maine statute into one of the traditional First Amendment analytic pigeonholes. I am troubled by denominating the statute an "incidental" restriction on expression that might be justified by a "sufficiently important governmental interest in regulating the nonspeech elements." United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). The state's asserted concerns highway safety, promotion of tourism, and aesthetics certainly seem to be interests "unrelated to the suppression of free expression," id. at 377, 88 S.Ct. at 1679, and there is no evidence that they are pretexts concealing more sinister designs. Moreover, it does appear that it is the physical existence per se of signs along the public highways, rather than any particular message communicated thereon, that offends those interests. Nevertheless, I do not believe that prohibiting the erection of signs could be analogized to prohibiting the destruction of draftcards, in order to fit the Maine statute into O'Brien's "incidental limitation" framework. Unlike draftcards, which have a purpose and meaning independent of any potential for speech by the holder, billboards are expression incarnate. While, in theory, the legislature's goals would be frustrated even if all highway signs were painted bright colors and conveyed no message whatsoever, we know that, in fact, people do not put up billboards simply for the sake of erecting objects along the roadways. As a practical matter, billboards do not have a purpose and meaning apart from their potential for speech. Thus, I cannot regard the statute as an "incidental" restriction on expression. Suppression of speech may not have been the motive of the legislature, but surely it was intentional, for it was a predictable and inevitable result of the enactment of this statute.
 
 
 47
 Nor am I completely comfortable labelling the statute a time, place, or manner restriction.
 
 
 48
 In the first place, permanent signs advertising the activities of certain organizations (churches and civic groups) and temporary signs advertising the happening of certain events (suppers, lawn sales, etc. of nonprofit organizations, and fairs and exhibitions) are exempted. The Supreme Court has recently reiterated that time, place, or manner regulations must be "applicable to all speech irrespective of content." Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980), quoting Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). "Governmental action that regulates speech on the basis of its subject matter 'slip(s) from the neutrality of time, place, and circumstances into a concern about content'." Id. at 4777, 100 S.Ct. at 2332, quoting Police Department v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). See Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 93-94, 97 S.Ct. 1614, 1618-19, 52 L.Ed.2d 155 (1977). Here, the three-week sign provision and the exemption for church and civic group informational signs undeniably discriminates "between lawful and unlawful conduct based upon the content of the ... communication." Carey v. Brown, 447 U.S. 455, 459, 100 S.Ct. 2286, 2289, 65 L.Ed.2d 263 (1980). Content-based distinctions are the most suspect form of First Amendment restriction. See Erznoznik v. City of Jacksonville, 422 U.S. at 209-12, 95 S.Ct. at 2272-2273; Police Department v. Mosley, 408 U.S. at 95-99, 92 S.Ct. at 2289-92. Therefore, at least these portions of the statute cannot be upheld unless careful scrutiny assures us that the distinctions are finely tailored to serve substantial, or perhaps even compelling, state interests. See Carey v. Brown, 100 S.Ct. at 2289-2292. (Court refers to both "substantial" and "compelling" governmental interests in discussing permissibility of content-based restrictions).
 
 
 49
 In my view, these exemptions do not pass this exacting test. For example, I fail to see any substantial state interest served by allowing a temporary sign that advertises a Christmas bazaar at the local church while prohibiting a sign of identical size, shape, color and duration that advertises a pre-Christmas sale at the local department store. Nor do I see a substantial justification for permitting a sign that states the meeting time of a civic organization while barring a similar sign announcing the meeting time of an individual's sewing circle. The court is apparently willing to accept such results as reflecting the "important governmental interest in dissemination of information of special public concern." With respect, I am not sure that the state can decide that the events and operations of nonprofit organizations are of special concern to the public while the events and operations of businesses and individuals are not. See Carey v. Brown, 100 S.Ct. at 2292 quoting Police Department v. Mosley, 408 U.S. at 95-96, 92 S.Ct. at 2289-90. Moreover, the categories of temporary signs now permitted are no less threatening to the goals of the statute than would be other types, especially those put up by businesses. It might even be argued that such categories are more likely to be aesthetically offensive because they will probably be designed and erected by amateurs and may be less carefully constructed and secured. Therefore, I would conclude that the content-based distinctions here have little or no bearing on the interests the statute purportedly furthers.[1] Cf. Carey v. Brown, 100 S.Ct. at 2292.
 
 
 50
 Leaving aside the special problems posed by the three-week sign provision and the exemption for civic and religious organizations, I have more fundamental difficulties with regarding the statute as a time, place, or manner regulation. In my opinion, there is merit in plaintiffs' argument that the near-total interdiction of highway signs and billboards accomplished by this statute cannot be viewed as merely a limitation on when, where, or how such speech can take place. It is not an over-statement to say that the statute virtually obliterates the right to speak by sign at any place visible from Maine's public roads. All off-premise ideological speech by sign (except that covered by the two exemptions discussed above) is outlawed unless it is the subject of an upcoming election or referendum. Because permissible on-premise signs are limited to those that "advertise (a) business, facility, or point of interest conducted thereon," an individual cannot engage in ideological speech by sign even on his own property if the sign is visible from a public roadway. Nor, apparently, can he publicize such events as a "Garage Sale" or "Free Kittens" that do not constitute a business conducted on the premises. Commercial entities are limited to six off-premise signs (OBDS) whose size, content and location are regulated and whose style must conform to mandated specifications. Content of on-premise commercial signs is unrestricted, but they may not exceed ten in number. All these restrictions apply not only to major commuter routes and interstate highways, but to every public road in the state.
 
 
 51
 The typical time, place, or manner restriction involves some limitation on a mode of expression. E. g., Grayned v. Rockford, 408 U.S. 104, 116-21, 92 S.Ct. 2294, 2303-2306, 33 L.Ed.2d 222 (1972) (anti-noise ordinance involving grounds adjacent to school); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) (picketing that unreasonably interferes with access to public buildings); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (demonstrations on jailhouse grounds); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (picketing or parading near courthouse); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (sound trucks emitting "loud and raucous" noises);[2] Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 296, 84 L.Ed. 460 (1940) (loitering or picketing at business establishment to deter public patronage). Cf. Carey v. Brown, --- U.S. ----, 100 S.Ct. 2281, 65 L.Ed.2d 263 (picketing in residential neighborhood with content-based exception); Police Department v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (picketing near school with content-based exception). In these cases, use of a method of communication was prohibited in some circumstances but remained available in others. Here, however, the state has imposed a virtually absolute ban on speech by sign and billboard everywhere within its boundaries. Cf. Lovell v. Griffin, 303 U.S. 444, 451, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). Perhaps it is only a question of degree, but it seems to me that when the state effectively removes one medium of communication from the palette of expressive modes available to a speaker, the difference is qualitative, rather than merely quantitative. See Martin v. Struthers, 319 U.S. 141, 146-47, 63 S.Ct. 862, 864-65, 87 L.Ed. 1313 (1943) (Court distinguishes anti-canvassing ordinance from mere time, place or manner regulation); Schneider v. New Jersey, 308 U.S. 147, 163-65, 60 S.Ct. 146, 151-152, 84 L.Ed. 155 (1939) (Court reluctant to view anti-leaflet ordinances as merely time, place or manner restrictions). It is often said that the First Amendment affords less protection to the medium than to the message. See, e. g., Kaufman, The Medium, The Message And The First Amendment, 45 N.Y.U.L.Rev. 762, 772 (1970). Certainly, the premise of the time, place or manner cases is that the state may regulate the form of expression to a greater extent than it can control content. See Consolidated Edison Co. v. Public Service Commission, 100 S.Ct. at 2331; Grayned v. Rockford, 408 U.S. at 115-16, 92 S.Ct. at 2302-2303; Cox v. Louisiana, 379 U.S. at 564-565, 85 S.Ct. at 480-481. However, where the method of communication at issue has been a traditionally-accepted channel for the expression of ideas and information, and where the method is not intrinsically dangerous to the speaker or the public, I find it very problematic that a state can virtually abolish that method under the guise of time, place or manner regulation.[3] Cf. Grayned v. City of Rockford, 408 U.S. at 117, 92 S.Ct. at 2303. ("Free expression 'must not, in the guise of regulation, be abridged or denied.' "); Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940) ("a state may not unduly suppress free communication of news ... under the guise of conserving desirable conditions"). At the least, I believe such legislation should be recognized as a very unusual, and very suspect, breed of time, place or manner restriction.
 
 
 52
 In sum, although it is a point on which reasonable minds can differ as the court's scholarly opinion exemplifies I would approach this statute as a deliberate and practically absolute suppression of speech expressed through a traditionally-used and commonly-accepted form of communication. It is in that light that I examine the First Amendment values implicated.
 
 
 53
 II. Nature of the First Amendment Infringement
 
 
 54
 As recognized by the court's opinion, the statute significantly restricts both ideological and commercial speech by sign. Of course, a governmental restriction on speech is not automatically invalid. Consolidated Edison Co. v. Public Service Commission, 100 S.Ct. at 2331. The decisive elements are the weight and urgency of the state's interests and the care with which the regulation is tailored to achieve them.
 
 
 55
 Maine has offered three justifications for the heavy burden it has imposed on written roadside communication. As the majority opinion persuasively demonstrates, the record before us simply does not support the asserted nexus between highway safety and the prohibition of signs and billboards. Beyond that, the state has expressed its concern for encouraging tourism and preserving the aesthetic purity of its many scenic vistas. I am not so sure as my brethren that the former of these interests is actually furthered by this statute. Without doubt, Maine's natural beauties attract tourists; presumably, the more unspoiled those beauties remain, the more tourists will sojourn in the state. However, the value of vacationers to the state lies not in their mere physical presence within its borders. Tourists are desired because they spend money. It stands to reason that the more frequently and forcefully visitors are assured of the desirability of the state's restaurants, motels, stores, and other attractions, the more likely they are to leave their money behind them in Maine. A law that silences a significant source of such assurances seems to me a peculiar way to foster tourism. Undoubtedly, there is a point at which the cost of roadside advertising (i. e. the number of tourists repelled by a billboard-filled highway) outweighs its economic returns, but the record before us contains no more evidence on this point than it does on highway safety. Therefore, I would conclude that the statute cannot be justified as a means of preserving the economic resource of tourism.
 
 
 56
 To my mind, then, the state's sweeping ban on billboards and highway signs must stand or fall on the basis of its concern for aesthetic values. In attempting to determine whether this interest is sufficient to warrant so great an intrusion on First Amendment rights, we are again confronted by analytic difficulties. As I have already noted, I am uncomfortable regarding the statute merely as an incidental limitation on expression or as the typical time, place or manner restriction. Rather, I would treat it as a deliberate suppression of speech, for Maine has singled out only one manmade intrusion on nature a form of speech as the target of its aesthetic concern. This creates a problem, however, in that different standards reflecting different quantums of constitutional protection, apply to restrictions on ideological and commercial speech. Thus, I follow the majority's lead in bifurcating the statute for purposes of analysis, considering it separately with respect to each type of speech. That we feel compelled to make a content-based analysis of what purports to be (with limited exceptions) a content-neutral statute further points up the difficult and unsettling nature of Maine's actions here.
 
 A. Impact on Ideological Speech
 
 57
 The First Amendment's prime solicitude for ideological speech is reflected in the stringent standard required of statutes that would deliberately suppress such speech: the restriction must be a precisely drawn means of serving a compelling state interest. Consolidated Edison Co. v. Public Service Commission, 100 S.Ct. at 2333. I concur with the court that Maine's statute is unconstitutional because I believe that the state's aesthetic concerns, legitimate and important as they are, are not sufficiently compelling to justify the near-total ban on ideological speech by sign. The First Amendment requires that we tolerate a certain amount of speech in forms that are not soothing to the ear or pleasing to the eye. See Cohen v. California, 403 U.S. 15, 21, 24-25, 91 S.Ct. 1780, 1787-88, 29 L.Ed.2d 284 (1971). Cf. Rowan v. Post Office Department, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970). In part, this reflects a solicitude for the speaker's ability to select the medium he believes most suited to his message; in part, it reflects a recognition that a medium which one listener finds ineffective or even offensive may be perceived by another as influential or even appealing. I do not think that the state can virtually eradicate ideological speech by billboard and highway sign simply because it believes that all its public roadways would be more aesthetically pleasing without the attendant clutter.[4]
 
 B. Impact on Commercial Speech
 
 58
 The impermissible burden imposed by the statute on ideological speech is sufficient to require its invalidation without even considering its effect on commercial expression. However, because the court devotes a substantial portion of its opinion to the commercial speech aspect, and because I feel constrained to disagree with some of what is said there, I also reach the commercial speech issue.[5]
 
 
 59
 The Supreme Court's most recent pronouncement in this area teaches that a deliberate suppression of commercial speech is permissible only when a substantial government interest is directly advanced by a statute no more extensive than necessary to serve that interest. Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (standard for accurate commercial speech concerning lawful activity.) I concur wholeheartedly with the court's eloquent testimony to the importance of aesthetic concerns, and I find the state's desire to preserve the beauties of its natural resources a substantial, even if not compelling, interest. See Berman v. Parker, 348 U.S. 26, 32-33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). I also agree that the statutory prohibition directly advances that interest. Anyone who frequently travels our highways for business or pleasure would probably agree that for every one billboard that is cleverly conceived, artistically executed, or especially informative, there are a dozen that are tasteless, insulting to the intelligence, or just plain ugly. It is hard to argue that many roads would not be more attractive if uncluttered by the importunities of billboard users.
 
 
 60
 My quarrel with the statute's suppression of commercial speech initially arose from my belief that its near-absolute ban is more extensive than is necessary to achieve the state's aesthetic goals. Surely it cannot be suggested that a garish billboard erected in the midst of a densely commercialized area has the same aesthetic impact as the identical billboard placed in a primeval forest. Signs and billboards are not universally incompatible with their surroundings,[6] and the state really has not attempted to show us to what degree its statute rescues areas in which the intrusion of billboards significantly spoils the existing environment. The court's response is that the state's aesthetic goals are frustrated if any part of the public highway is cluttered by signs; it does not serve the legislature's purpose to condemn some areas to remaining ugly, or become uglier. This point is well taken. Exempting certain portions of the roadside (as defined, perhaps, by existing zoning patterns) would undoubtedly create billboard ghettos, for those desiring to employ the medium of sign would flood all available areas until they become supersaturated with billboards. Therefore, although my doubts are not entirely quelled, I am willing to concede that the statute's broad sweep may be necessary fully to implement the state's desire to beautify and unclutter its public highways.
 
 
 61
 Once this concession is made, however, the thorniest problem with a statute banning commercial speech by sign is exposed. Central Hudson requires that there be a tight nexus between the desired ends and the chosen means. Here is a case where the degree of the statute's effectiveness is directly proportional to the degree it impinges on commercial speech. The more grievous the burden on First Amendment rights, the more perfect the "means"/"ends" fit, for if we agree with the state that aesthetic concerns forbid permitting even unattractive areas to be made uglier by billboards, then we must conclude that any roadside sign is a threat to the statutory purpose. I believe this is a rare situation in First Amendment cases. Usually, a far-reaching, speech-suppressive statute is drawn more broadly than the state's concerns require. E. g., Carey v. Brown, 100 S.Ct. at 2291-2296; First National Bank of Boston v. Bellotti, 435 U.S. 765, 794-95, 98 S.Ct. 1407, 1425-26, 55 L.Ed.2d 1407 (1978); Bates v. State Bar of Arizona, 433 U.S. 350, 383-84, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977); Carey v. Population Services International, 431 U.S. 678, 700-02, 97 S.Ct. 2010, 2024-25, 52 L.Ed.2d 675 (1977). Such was the case in Central Hudson itself. See 100 S.Ct. at 2352. Thus, the Court there did not have to confront the question whether, in a case where breadth corresponds to effectiveness, the state can be required to settle for a less efficacious method in order to preserve some portion of the speech that will otherwise be lost. In other words, when the means-ends fit is too good, such that a gain in one value necessarily requires a loss of the other, must the state accept a compromise?
 
 
 62
 The court would apparently answer this question "no," for the clear implication of the court's opinion is that this statute, if limited to commercial speech, would be constitutional. With deference to the erudite and thoughtful approach the court takes, I simply do not agree that the survival of commercial speech by sign can be left to the grace of Maine's legislature.
 
 
 63
 The costs imposed on the commercial speaker by this statute are great. Billboards offer a high degree of exposure for a relatively low cost. Leaflets and brochures may be comparably inexpensive, but because they cannot be obtained without the driver's active assistance i. e., stopping, pulling off at an information center, and selecting materials from an array they do not possess the same potential for audience impact. Some travelers will choose to forego the product rather than interrupt their drive and attempt to locate the necessary information.[7] Others, who possess no conscious desire for the product but who would have become interested had promotional materials come to their attention, see Linmark Associates, Inc. v. Willingboro, 431 U.S. at 93, 97 S.Ct. at 1618, will also be lost as customers.
 
 
 64
 Signs and billboards also have a unique capacity for timely appeals to traveling consumers. The speaker advertising by radio or newspaper and, to a certain extent, by leaflet or brochure must hope for a fortuitous coincidence of information, desire, and opportunity to act. Billboards can be placed at appropriate locations and intervals, presenting the speaker's message to the audience at a point at which they can be persuaded to act upon it. By contrast, travelers may hear the radio ad for "Mrs. Wilson's Homemade Ice Cream" twenty miles after they passed the turnoff to her restaurant, or they may find the brochure for Lakeside Country Inn the day after they have established themselves in another hostel.
 
 
 65
 The state has tried to alleviate these burdens somewhat by the provision of OBDS.[8] However, the value of these signs for many commercial advertisers is, to my mind, questionable. Homogeneity is the soul of the OBDS concept; through regimentation of "size, color, lighting, manner of display and lettering," 23 M.R.S.A. § 1910, the state attempts to ensure that every merchant's sign looks like the sign of every other merchant. Even with the expansion of permissible content envisioned by the court, the opportunity for product differentiation through creative or provocative advertising is sharply curtailed. This may not matter a great deal to a Howard Johnson or a Burger King, whose name alone conjures up an entire image of the product in the reader's mind. For the small, local hotel or restaurant, however, such uniformity may leave them virtually indistinguishable from their competitors. More important, government imposed conformity treads on a cherished First Amendment value: the freedom of the speaker to clothe his message in the style and form he deems most satisfying and effective. Admittedly, this freedom is not absolute. However, its loss is an element that must be reckoned as one of the costs exacted by this statute.
 
 
 66
 Against these costs imposed on commercial speech, we must assess the benefit that accrues to Maine's citizens. Even assuming that a total ban on billboards will produce some aesthetic gain in all highway areas, the quantum of improvement will obviously vary with the site involved. In undeveloped areas, it may very well be that signs and billboards are the principal eyesores; here, the benefit will be great, for their removal would return the landscape to its pristine beauty. In industrial and commercial areas, however, signs and billboards are but one of countless types of manmade intrusions on the natural landscape. Without denying that some perceptible change for the better would occur even here, I question whether the margin of improvement obtained in these areas can really justify the state's decision to virtually eradicate commercial speech by sign and billboard. Cf. Schneider v. New Jersey, 308 U.S. at 162-63, 60 S.Ct. at 151. If any one, consistent thread runs through First Amendment jurisprudence, surely it must be the recognition that the preservation of free expression is neither easy nor comfortable. It often requires of us that we tolerate things we would rather not see and endure things we would rather not hear. It requires that we accept a less-than-perfect world a world that is not as quiet,[9] as neat,[10] as refined,[11] or even, I believe, as scenic as we might like.
 
 
 67
 In my view, therefore, Maine could not save this statute by limiting its application to commercial speech. I do not believe that Central Hudson was intended to preclude a balancing test when a statute imposes a near-total ban on one medium of communication. Cf. Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Schneider v. New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Perhaps a different case would be presented were the billboard ban limited to selected scenic highways or to areas not zoned for industrial or commercial development.[12] Undeniably, such an approach would be a less thorough vindication of the state's aesthetic concerns; it would have the virtue, however, of allowing those concerns to coexist with First Amendment values without imposing a grievous burden on either interest.
 
 
 68
 One final point must be made. The court finds it easier to approve the state's attempts at fullscale restriction of signs and billboards because "deprivation of highway opportunities is not as legally objectionable as some other curtailments." This seems to me somewhat of an inversion of the traditional approach in First Amendment cases. "(S)treets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." Carey v. Brown, 100 S.Ct. at 2289, quoting Amalgamated Food Employees Union v. Logan Valley Plaza, 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968). See Schneider v. New Jersey, 308 U.S. at 163, 60 S.Ct. at 151 ("the streets are natural and proper places for the dissemination of information and opinion"). Although use of the streets by merchants extolling their wares and services may not have the same place in the hierarchy of First Amendment values as does the activity of social reformers and political dissidents,[13] it is a practice equally time-honored. Plaintiffs here do not demand that the state permit government property to be appropriated to their use. Cf. Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); Lehman v. Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion). See Consolidated Edison Co. v. Public Service Commission, 100 S.Ct. at 2333. They seek merely the right to continue using privately owned land to communicate with highway travelers. Certainly, public roadways are not created for the convenience of advertisers. However, since we have rejected the suggestion that commercial speakers obstruct or make perilous the intended use of the roadways, I do not see that the state has any greater power to prevent speakers from reaping the incidental benefits of public congregation on the highways than it has to restrict their access to an audience gathered in any other public place.
 
 
 69
 For all these reasons, then, I join in the court's conclusion that the Maine Traveler Information Services Act is unconstitutional, but I cannot subscribe to the suggestion that an equally sweeping ban levelled against commercial speech by sign would be acceptable.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 Plaintiffs' brief reciprocates by naming the law the Maine Anti-Billboard Act. Both sides are following tradition. The restrictions introduced by the Federal Highway Beautification Act are announced as promoting "effective display of outdoor advertising ...." 23 U.S.C. § 131(d), as if the industry were receiving needed help in running its business. For a cynical account of the non-enforcement of that act, see N. Price, On Billboards, Sierra, Sept.-Oct. 1980, 76
 
 
 [2]
 As a matter of record we note that the 1977 form, which was before the district court, has since been amended, notably a new section 1913, Me.Laws 1979, c. 477, a fact plaintiffs' brief fails to recognize
 
 
 [3]
 The two companies together own almost 1000 of some 2500 billboards in the state. The individual plaintiff claims that he wishes to see signs reminding him to drive safely and slowly, and to avoid littering the highways. His affection for manmade, over "nature's symbols and signs," may possibly be enhanced by the fact that he is an employee of one of the corporate plaintiffs. As this is not a class suit, the size of the class that could adequately be represented by the individual plaintiff is not before us. In this opinion we refer usually to the corporate plaintiffs who, in any event, have full standing to bring suit. See Bigelow v. Virginia, 1975, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600
 
 
 [4]
 § 1913. Categorical signs
 
 
 [1]
 Types of signs. The following signs may be erected and maintained without license or permit under this chapter as follows:
 A. Signs of a duly constituted governmental body, ...;
 B. Signs located on or in the rolling stock of common carriers, except those which are determined by the commissioner to be circumventing the intent of this chapter ....;
 C. Signs on registered and inspected motor vehicles, except those which are determined by the commissioner to be circumventing the intent of this chapter ....;
 D. Signs, with an area of not more than 260 square inches, identifying stops or fare zone limits of motor buses;
 E. Signs showing the place and time of service or meetings of churches and civic organizations in the municipality or township. Each church or civic organization may erect no more than 4 signs. No sign shall exceed in size 24 inches by 30 inches;
 F. Signs to be maintained for not more than 3 weeks announcing an auction, public supper, lawn sale, campaign, drive or other like event of a public, civic, philanthropic or religious organization, provided these signs are located within the municipality or township where the activity is located. The date of this event is to be conspicuously posted on each sign;
 G. Memorial signs or tablets;
 H. Signs erected by fairs and expositions within the county where the activity is located. These signs may be erected and maintained for 3 weeks before this event. The date of the event is to be conspicuously posted on each sign;
 I. Signs erected for an election, primary or referendum. These signs shall be erected no sooner than 3 weeks before the date of the election, primary or referendum and shall be removed no later than one week after that date; and
 J. Signs erected outside of the public right-of-way by nonprofit historical and cultural institutions. Each institution, who has certified its nonprofit status with the commissioner, may erect no more than 2 signs with a surface area not to exceed 50 square feet per sign.
 
 
 [5]
 We hereafter use the adjective "ideological" "relating to or concerned with ideas," Webster's New Int'l Dictionary, Third Ed. (1968) as a shorthand reference to all noncommercial speech. "Commercial" speech, on the other hand, relates "solely to the economic interests of the speaker and its audience." Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, ante, 100 S.Ct. at 2349. That the distinction is viable, see id., is not to suggest it is always easy. See Schaumburg v. Citizens, ante, 444 U.S. at 628-32, 100 S.Ct. at 831-833
 
 
 [6]
 § 1903. Definitions
 
 
 [7]
 Official business directional sign. "Official business directional sign" means a sign erected and maintained in accordance with this chapter, to indicate to the traveling public the route and distance to public accommodations, facilities, commercial services for the traveling public and points of scenic, historical, cultural, recreational, educational and religious interest
 § 1906. Official business directional signs.
 
 
 [1]
 Erection and maintenance. The commissioner, with the advice of the Travel Information Advisory Council, shall designate locations for and erect official business directional signs licensed under this chapter. The official business directional signs shall be furnished and preserved by the applicant thereafter and shall conform to regulations issued by the commissioner with the advice of the Travel Information Advisory Council. Such regulations shall be consistent with section 1910
 § 1910. Types and arrangements of signs.
 Subject to this chapter, the commissioner, with the advice of the Travel Information Advisory Council, shall regulate the size, shape, color, lighting, manner of display and lettering of official business directional signs. Such regulations shall require uniformity among signs in accordance with the following minimum requirements: No sign shall exceed in size 20 inches by 84 inches; uniform colors shall be specified for each type of service and facility; lettering size shall be uniform; logos shall not exceed a uniform size; and posts shall be a uniform size, shape and color. An appropriate symbol may be specified for each type of eligible service or facility for inclusion upon official business directional signs.
 
 
 [7]
 We are without the district court's appraisal of the record on this point. Having found other grounds for upholding the statute, it did not reach this issue
 
 
 [8]
 It is perhaps not unduly apprehensive to foresee serious First Amendment problems in advance rulings against individual signs. Cf. Shuttlesworth v. Birmingham, 1969, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162; Staub v. Baxley, 1958, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302; Kunz v. New York, 1951, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (cases invalidating permit requirements restricting expression)
 
 
 [9]
 Number, height, size, location, lighting, etc. of on-premise signs are carefully regulated. See section 1914, subsection 6. Subject to comments elsewhere in this opinion we generally accept this principle
 
 
 [10]
 § 1905. Official tourist information centers
 To the extent funds are available or contracts can be entered into, the commissioner shall establish official tourist information centers near the principal entrance points into the State, as determined by the commissioner, and at such other locations as the commissioner deems appropriate in order to provide information about public accommodations, facilities, commercial services and other business for the traveling public, and points of scenic, historic, cultural, recreational, educational and religious interest.
 
 
 [11]
 § 1907. Published information
 To the extent funds are available or contracts are entered into, the commissioner shall provide directories, guidebooks, maps and other published information, showing the location of routes and available public accommodations, facilities, commercial services for the traveling public and other businesses and points of scenic, recreational, historic and cultural interest. He may include in those guidebooks, and other published materials, paid advertising, identified as such, and shall make them available to visitors and to the general public at information centers and booths, service stations and garages, hotels, motels and restaurants, historical attractions and educational facilities, and such other places as he may find desirable. The commissioner shall cooperate with other state, federal and local agencies that provide information to travelers in the administration of this section.
 
 
 [12]
 Plaintiffs' statement that "no existing legitimate business has ever been governmentally excluded from an entire state in the absence of a specific provision in the United States Constitution" is simply wrong on the facts. Moreover, the billboard law contains a feature conspicuously absent in the anti-liquor statute sustained in Mugler ; owners of billboards are compensated for the removal of their structures or are allowed to amortize their cost over a specified period. 23 M.R.S.A. §§ 1915-16. The issue of the adequacy of the compensation and amortization provisions is not before us
 
 
 [13]
 It is also fallaciously based. The record shows, for example, that 24% of Donnelly's gross advertising space, devoted to ideological use, is largely donated. This must substantially affect pro rata cost figures. We remark, in passing, that we do not accept Donnelly's argument that since its ideological contributions are dependent upon revenues of its commercial advertising, the latter should be afforded the protection due the former
 
 
 [1]
 The statute provides other content-based exemptions not discussed here. Some e. g., bus signs and traffic signs are undoubtedly sustainable. Others, particularly an exemption of only three weeks for political signs, are exceedingly suspect. Because I believe that the statute is invalid in its entirety, I do not consider the particular problems that the various exemptions may present
 
 
 [2]
 Kovacs, which sustained a municipal sound truck ordinance, is the case in which the Court appears to have come closest to regarding the eradication of a method of communication as a time, place or manner restriction. I believe, however, that that case does not in fact stand for so broad a proposition. Writing for the Court, Justice Reed stated:
 Unrestrained use throughout a municipality of all sound amplification devices would be intolerable. Absolute prohibition within municipal limits of all sound amplification, even though reasonably regulated in place, time and volume, is undesirable and probably unconstitutional as an unreasonable interference with normal activities.
 336 U.S. at 81-82, 69 S.Ct. at 451.
 Thus, it appears that the issue was the city's ability to regulate the manner of amplification i. e., "loud and raucous" rather than the permissibility of a total ban. Citations to Kovacs in later cases seem to support this reading. E. g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976); Grayned v. Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). Cf. Saia v. New York, 334 U.S. 558, 561-62, 68 S.Ct. 1148, 1150, 92 L.Ed.2d 1574 (1948) (recognizing the importance of soundtrucks as a medium of expression).
 
 
 [3]
 My doubts are in part rooted in the recognition that the government need show only a significant interest and the presence of ample alternative channels for communication in order to justify a time, place or manner restriction. See Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 534, 100 S.Ct. 2326, 2331, 65 L.Ed.2d 2326 (1980). It seems to me that this standard does not afford sufficient protection for First Amendment values when the loss of a commonly-accepted medium of expression is the price exacted by the statute. Suppose the state were to ban newspapers, citing the environmental damage attendant on their production and the waste disposal problems created by their use. Would we be willing to sustain such a statute even if the state could show that, in a society which increasingly prefers the electronic media to reading, radio and television are adequate alternative methods of reaching most people?
 The method of expression may not have the same claim to First Amendment protection as does the content. See Grayned v. Rockford, 408 U.S. at 115-16, 92 S.Ct. at 2302-2303; Cohen v. California, 403 U.S. 15, 18-19, 91 S.Ct. 1780, 1784-85, 29 L.Ed.2d 284 (1971). The law is not yet prepared to agree with Marshall McLuhan that the medium is the message. However the speaker's ability to choose the medium is, I believe, a distinct and important part of First Amendment rights. (I am speaking here, of course, of methods of expression that do not threaten the speaker or the person or property of another.) Whether we view it from the speaker's perspective, and say that the choice of medium is a component of the personal fulfillment fostered by the First Amendment, see Cohen v. California, 403 U.S. at 25-26, 91 S.Ct. at 1788, or from the audience's perspective, and say that each medium makes a unique sensory and psychological impact that cannot be precisely duplicated by any other, the speaker's autonomy in medium selection is a factor that should not be undervalued. When the state would outlaw a mode of expression particularly a mode that has traditionally received society's approval, or at least tolerance more is involved than simply whether the speaker can adequately convey her message using means the state will permit her to employ. Cf. Schneider v. New Jersey, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed.2d 155 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"). See also Thornhill v. Alabama, 310 U.S. 88, 95-96, 105-06, 60 S.Ct. 736, 745-746, 84 L.Ed. 1093 (1940). The standard we use to review such legislation should at least recognize all that is at stake.
 
 
 [4]
 My conclusion as to this statute's invalidity would not change were I to analyze it as merely a time, place or manner regulation. Even if the state's aesthetic concerns qualify as a significant governmental interest, I concur wholeheartedly with the court's assessment that there are no adequate alternative channels for many ideological speakers if billboards and highway signs are entirely banned. Whether Maine could accomplish a more limited restriction of ideological speech by sign (as, for example, by banning all billboards on designated scenic highways or limiting their erection by zoning area) is not, of course, before us
 
 
 [5]
 The court seems to assume that Maine could constitutionally enact a statute, of the same comprehensiveness as the one before us, that explicitly limits its applicability to commercial speech. Putting aside my reservations, set out infra, as to the seriousness of the burden this would place on commercial expression, I am not so sure as the court that the state could openly discriminate against commercial speech in such a fashion. See e. g., Carey v. Brown, 100 S.Ct. at 2294 & n.13 (implying it an open question whether "certain state interests may be so compelling that where no adequate alternatives exist a content-based distinction if narrowly drawn would be a permissible way of furthering those objectives"). But see Young v. American Mini Theatres, Inc., 427 U.S. 50, 65-70, 96 S.Ct. 2440, 2449-50, 49 L.Ed.2d 310 (1976) (plurality opinion). For one thing, to permit the uninhibited use of ideological billboards undercuts, to at least some degree, the rationale for banning the erection of commercial signs. I do not imply that this is necessarily a case where the state is damned if it doesn't distinguish between commercial and ideological speech, and damned if it does. Cf. Carey v. Brown, 100 S.Ct. at 2297 (Rehnquist, J., dissenting). I merely wish to note that, for me, the question is not so easily resolved
 
 
 [6]
 In Times Square, for example, signs are an integral aspect of the locale. Indeed, in some areas, a billboard or other sign may be the most interesting and attractive feature of the landscape, a welcome distraction from urban blight or industrial sprawl
 
 
 [7]
 Anyone who, feeling the urge for a snack or a cup of coffee on a long drive, has scanned fast-food restaurant billboards seeking the magic phrase "Easy on-Easy off" can probably attest to the phenomenon of desiring a product only if the cost in time and inconvenience is not too great
 This observation also raises questions about the right of traveling consumers to receive the commercial information imparted by billboards and signs. While this element has not been emphasized in argument and consideration of the case, it must at least be acknowledged as present and of constitutional significance. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. at 756-57, 96 S.Ct. at 1822, 48 L.Ed.2d 346. Moreover, the Supreme Court has declined to limit consideration of this interest to the situation where the information sought to be received by consumers would not otherwise be reasonably available:
 We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated.
 Id. at 757 n.15, 96 S.Ct. at 1823 n.15.
 
 
 [8]
 It should be noted that OBDS do not possess the same potential for timely appeals to travelers as the system of unregulated billboards they are intended to replace. No commercial entity may have more than one OBDS per public roadway leading to its establishment. The OBDS may only be located at intersections where travelers must change directions to reach the advertised product. Thus, potential consumers must be attracted through a single appeal, and they will have little opportunity to consider or discuss the desirability of the product before they must decide whether to divert from their route to seek it
 
 
 [9]
 See, e. g., Saia v. New York, 334 U.S. at 561-62, 68 S.Ct. at 1150 (loudspeakers)
 
 
 [10]
 E. g., Schneider v. New Jersey, 308 U.S. at 162, 60 S.Ct. at 151 ("the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it")
 
 
 [11]
 E. g., Carey v. Population Services International, 431 U.S. 678, 700-01, 97 S.Ct. at 2024 (1977) (advertising and display of contraceptive devices); Cohen v. California, 403 U.S. at 24-25, 91 S.Ct. at 1787-1788 (jacket inscribed with vulgar phrase)
 
 
 [12]
 I do not believe that a system of selective restrictions would be as difficult to formulate as my brethren fear. The existing zoning codes represent governmental decisions about land use priorities. They might be readily adapted to serve as the basis of sign and billboard regulations. Designation of some public roads as scenic highways also seems a reasonable, and reasonably easy, method of selective restriction. Some states, as well as some private travel associations, have already made such assessments
 
 
 [13]
 But see The Supreme Court, 1979 Term, 94 Harv.L.Rev. 165-68 (1980) (arguing that there is no principled basis for affording commercial speech a lesser degree of constitutional protection)