CITY OF LAKEWOOD, Colorado, a municipal corporation, and James K. Spore, Zoning Administrator and Superintendent of Code Enforcement, Defendants-Appellants,

v.

COLFAX UNLIMITED ASSOCIATION, INC., a nonprofit corporation; Aubrey and Margaret K. Daedlow d/b/a Golden Hours Motel, a proprietorship; Gordon Neon Company, a corporation; Washburn Enterprises, Inc. d/b/a Trailerland, a corporation; Levitz Furniture Company of the Midwest, Inc., a corporation; Cornell Prescription Pharmacies, Inc., a corporation; on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees.

No. 28478.

Supreme Court of Colorado, En Banc.

Sept. 21, 1981.

Brown, Maynard & Miller, Glen Maynard, David A. Solomon, Robert Warren, Golden, for defendants-appellants.

Pryor, Carney & Johnson, Thomas L. Roberts, John E. Walberg, Englewood, for plaintiffs-appellees.

DUBOFSKY, Justice.

The defendant City of Lakewood appeals from an order of the Jefferson County District Court declaring that section 3–3 of the City's Zoning Ordinance (the Sign Code or Code) is unconstitutional. Because we conclude that many of the Code's provisions violate the First and Fourteenth Amendments to the United States Constitution and cannot be severed from the remainder of the Code, we affirm the judgment below.

The plaintiff-appellees are owners and users of commercial on-premises advertising signs in Lakewood.[1] The named plaintiffs, Colfax Unlimited Association, Inc.; Wash-

---

1. These signs were lawfully constructed prior to the 1971 effective date of the Code. Under the Code, as subsequently amended, the signs were classified as nonconforming uses and placed on an amortization schedule which required their discontinuance by July, 1976.

burn Enterprises, Inc., d/b/a Trailerland; A. M. Baedlow, d/b/a Golden Hours Motel; Cornell Prescription Pharmacies, Inc.; Gordon Neon Company; and Levitz Furniture Company of the Midwest, Inc., certain of whose signs do not comply with section 3–3, brought this action on behalf of themselves and a similarly situated class of approximately 500 parties, seeking declaratory relief and an injunction prohibiting Lakewood from enforcing the Code. The class was certified by the district court in accordance with C.R.C.P. 23(b)(2), and Lakewood agreed, by stipulation, to suspend enforcement of the Code until the conclusion of this litigation.

Following a trial to court, the district court entered an order declaring the Code unconstitutional and permanently enjoining its enforcement. Among its many conclusions of law, the court ruled that the plaintiffs possessed standing to challenge the Code as facially overbroad; that the Code was unconstitutionally overbroad and invalid on its face; that the Code was void for vagueness; that the Code constituted an impermissible delegation of legislative power to the executive branch; that Lakewood, a statutory municipality, lacked the power to regulate the number and type of signs which could be displayed on lots within its different zoning districts; that the Code unconstitutionally discriminated among different users of the same medium of communication in violation of *U.S.Const.* amends. I and XIV; and that, notwithstanding the Code's severability clause, its deficiencies were so pervasive that it could not be salvaged as a meaningful legislative enactment.[2] Although we disagree with several of the conclusions reached by the district court, we too conclude that the Code is flawed by basic constitutional infirmities and cannot be salvaged by a narrowing construction or severance of the unconstitutional provisions.[3]

## I.

Before considering the merits of the plaintiffs' multifaceted attack on the Sign Code, we must inquire whether the named and unnamed members of the plaintiff class possess standing to challenge both the provisions of the Code they characterize as unconstitutionally overbroad and those challenged on other constitutional and nonconstitutional grounds. *See, e. g., Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977).[4]

## A.

We recently summarized the principles governing First Amendment overbreadth litigation in *Marco Lounge, Inc. v. City of Federal Heights,* Colo., 625 P.2d 982 (1981). In that case, we recognized that the rules of standing are broadened in First Amendment cases to allow parties to whom the laws or regulations could constitutionally be applied "to assert the facial unconstitution-

---

2. However, the court upheld the Code's five-year amortization period for nonconforming signs as a reasonable regulation of private property, finding that the provision permitted continuance of the use to the extent necessary to safeguard the plaintiffs' investments. *See Veterans of Foreign Wars v. City of Steamboat Springs,* 195 Colo. 44, 575 P.2d 835 (1975); *Service Oil Company v. Rhodus,* 179 Colo. 335, 500 P.2d 807 (1972). *See also Art Neon Company v. City and County of Denver,* 488 F.2d 118 (10th Cir. 1973). Although the plaintiffs did not file a notice of cross appeal, they now seek to appeal this portion of the district court's ruling, *see Delta v. Thompson,* 37 Colo. App. 205, 548 P.2d 1292 (1975). However, because of our disposition of Lakewood's appeal, we need not consider the procedural or substantive issues raised by the plaintiffs' attack on the Code's amortization schedule.

3. Because the Code is thirty-two pages long, only relevant provisions, designated by section and subsection, are set forth in footnotes *infra.* Similarly, because many of the facts found by the district court have little or no bearing on our resolution of the issues raised by the parties, a detailed summary of the court's findings is omitted. Relevant facts are noted in connection with the discussion of each issue.

4. The discussion of standing in Section I does not exhaustively dispose of all the standing questions raised by the plaintiffs' challenge to the Code. For organizational reasons, however, those additional standing questions will be dealt with separately in the sections devoted to particular provisions of the Code.

ality of laws or regulations which may create a chilling effect on the freedom of expression of persons not before the court." *Id.,* Colo., 625 P.2d at 985.

The reason for the expansive standing rule in such cases is that

" '[t]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes.' "

*Id.,* quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 840 (1973).

 However, we also warned in *Marco Lounge* that "[t]he doctrine of overbreadth must be applied with caution, in recognition of the interest of the state in controlling harmful, constitutionally unprotected conduct." *Id.* We then drew upon the reasoning of *Broadrick v. Oklahoma, supra,* concluding that:

" '[F]acial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. [Citation omitted.] To put the matter an-

other way, particularly where conduct and not merely speech is involved, *we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.*' "

*Marco Lounge, Inc. v. City of Federal Heights, supra,* Colo., 625 P.2d at 985–986 (emphasis added). *Accord May v. People,* Colo., 636 P.2d 672 (1981). Therefore, to determine whether the plaintiffs have standing to assert First Amendment third-party rights in this case, we must ascertain whether the overbreadth of challenged Code provisions is not only real, but substantial. *See Parrack v. Town of Estes Park,* Colo., 628 P.2d 1014 (1981); *Williams v. City and County of Denver,* Colo., 622 P.2d 542 (1981).

**B.**

It is well-settled that signs, like many other communication media, possess both communicative and noncommunicative characteristics. Although the government has a legitimate interest in controlling the noncommunicative aspects of signage, its power to regulate the medium's communicative features is narrowly circumscribed by the First and Fourteenth Amendments. *Metromedia, Inc. v. City of San Diego,* —— U.S. ——, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). *Accord Williams v. City and County of Denver, supra. See also Veterans of Foreign Wars v. City of Steamboat Springs,* 195 Colo. 44, 575 P.2d 835 (1978). It is equally well-settled that commercial as well as ideological [5] speech is protected by the First Amendment. *See, e. g., Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *May v.*

---

**5.** We follow the First Circuit's opinion in *John Donnelly and Sons v. Campbell,* 639 F.2d 6 (1980) and "use the adjective 'ideological'—'relating to or concerned with ideas,' Webster's New Int'l Dictionary, Third Ed. (1968)—as a shorthand reference to all noncommercial

speech." "Commercial speech is 'speech proposing a commercial transaction.' " *Central Hudson Gas v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *May v. People, supra.*

*People, supra.* Based on these premises, we consider, section-by-section, the challenged Code provisions.

### C.

█ The plaintiffs first contend, and the trial court held, that the Code's definition of "sign," section 3–3(B)(23) [6] (the definitional section) is overbroad because it is "virtually limitless." While we do not disagree with the characterization of the definition as "limitless," that characteristic alone is not sufficient to demonstrate that the overbreadth is either real or substantial. An ordinance or statute is overbroad only if it impermissibly *proscribes* or *regulates* constitutionally protected expression. *See Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). The definition of "sign" considered alone neither proscribes nor regulates expression—it simply defines the class of "objects and devices" regulated under the Code's substantive provisions.

It makes little sense to ask whether the definitional section is overbroad; the question must be framed by asking whether the definitional section is an overbroad regulation of protected expression in the context of the particular substantive regulatory provisions which may be enforced against "objects or devices" defined as "signs." For that purpose, the first consideration is whether the definitional section is overbroad as incorporated in section 3–3(F) which regulates the type, number, location, height and other physical characteristics of signs in different zoning districts in Lakewood and the second is whether the definition is overbroad as incorporated in section 3–3(G)(2) which provides that

"No person, firm, or corporation shall erect, construct, enlarge, alter, move or convert any sign in the City, or cause the same to be done, without first obtaining a separate building permit for each such sign, pursuant to the Building Code of the City of Lakewood . . . ."

To the extent that these and other substantive regulatory provisions of the Code purport to regulate only the time, place, and manner of expression and to require a permit before a sign is constructed, altered or moved, the alleged overbreadth of the definitional section can only be premised on the following, hypothetical constitutional infirmities: (a) Lakewood may be forbidding or regulating the time, place or manner of ideological speech,[7] conveyed to the

---

**6.** Section 3–3(B)(23) of the Lakewood Sign Code provides:

"*Sign.* Any object or device, or part thereof, situated outdoors or indoors, and which object or device or the effect produced is to advertise, announce, identify, declare, demonstrate, display, instruct, direct or attract attention by means including, but not limited to, words, letters, figures, designs, fixtures, colors, motions, illumination, sound, and projecting images. Sign, however, does not include the following items:

(a) Flags of nations, or an organization of nations, states, cities or fraternal, religious or civic organizations;
(b) Merchandise or models of products or services incorporated in a window display;
(c) National, state, religious, fraternal, professional or civic symbols or crests;
(d) Scoreboards on athletic fields; and
(e) In residential neighborhoods, announcements of charitable or public service functions or participation as long as such announcements are located on the same developed lot as the building housing the person or group of persons participating in such functions or services. Such announcements may include but not be limited to: helping hand symbols, announcement of church bazaars or rummage sales, or announcement of participation in money-raising projects for charitable purposes. Such announcements may also include announcement of private garage sales so long as said announcements are located on the same developed lot as the person conducting the garage sale."

**7.** Under *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the overbreadth doctrine may not be invoked to invalidate regulations which threaten to chill only commercial speech. While the *Bates* Court recognized that commercial speech is entitled to First Amendment protection, it also observed that commonsense differences between commercial and ideological speech—notably, the durability the former acquires from its link to commercial well-being—minimize the risk that protected commercial speech will be muted by an overbroad law. Thus, in the commercial context, the principal justification for the relaxation of traditional rules of standing to permit litigants to assert First Amendment third-party rights is weak. Therefore,

public via a medium of communication which can be subsumed under the Code's definition of "sign," under circumstances or for reasons which do not justify the restrictions;[8] (b) Lakewood may be requiring a permit for a medium of communication which can be subsumed under the Code's definition of "sign" under circumstances insufficient to justify the burden imposed on ideological expression. *See Veterans of Foreign Wars v. City of Steamboat Springs, supra* (under the circumstances, the permit requirement imposed by Steamboat Springs' sign code was not tantamount to a prior restraint on free expression).

■ Because the legitimate sweep of the Code's time, place, manner and permit regulations is indisputably broad, *see Metromedia, Inc. v. City of San Diego, supra; Williams v. City and County of Denver, supra; Parrack v. Town of Estes Park, supra,* because the media of expression subject to regulation under the definitional section comprise both expressive and nonexpressive features, *id.,* and because, in the context of an overbreadth analysis, we may consider only the Code's potential chilling effect on ideological speech, *see Bates v. Arizona State Bar, supra,* and n. 7, *supra,* we deem the overbreadth of the definitional section, as it is incorporated by the Code's several substantive regulatory provisions, insubstantial.[9] *See Broadrick v. Oklahoma, supra; Parrack v. Town of Estes Park, supra;*

*Williams v. City and County of Denver, supra.* It follows that plaintiffs, named and unnamed commercial enterprises which own and maintain conventional, on-site commercial advertising signs, lack standing to assert the First Amendment third-party rights of ideological speakers whose choice of unconventional media of expression, arguably falling within the Code's definition of "sign," may be deterred by the threat that they will be prosecuted for violating unconstitutional time, place, manner or permit regulations.

### D.

The trial court held and plaintiffs assert that the definitional section is not only overbroad, but unconstitutionally vague. We conclude that plaintiffs, named and unnamed, lack standing to challenge the definitional section on this ground.

■■ While vagueness and overbreadth claims often go hand in hand in First Amendment cases, each addresses a separate constitutional infirmity. A vague law fails to reasonably forewarn persons of ordinary intelligence of what is prohibited so that they may act accordingly and lends itself to arbitrary and discriminatory enforcement because it fails to provide explicit standards for those who apply it. *See Broadrick v. Oklahoma, supra; Grayned v.*

even if the definitional section as incorporated by one of the Code's substantive regulatory provisions were to deter or threaten to deter protected commercial speech, plaintiffs would lack standing to attack it as facially invalid. *Accord Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, supra; Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

8. The United States Supreme Court succinctly summarized the standards which must be met by a constitutionally valid time, place or manner regulation in *Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, Inc., supra.*

"We have often approved restrictions of that kind provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they

leave open ample alternative channels for communication of the information."
425 U.S. at 771, 96 S.Ct. at 1830, 48 L.Ed.2d at 363–64. *See Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Williams v. City and County of Denver, supra; Veterans of Foreign Wars v. City of Steamboat Springs, supra. Broadrick v. Oklahoma, supra,* noted that a time, place and manner regulation may be unconstitutionally overbroad. *Accord May v. People, supra.*

9. The Code has not been enforced against unconventional media of ideological expression. This is tantamount, at least as a practical matter, to a narrowing construction of the definition of "sign." *See Broadrick v. Oklahoma, supra.* Should such cases arise, they may be dealt with on an individual, "as-applied" basis. *Id. See May v. People, supra.*

*City of Rockford, supra; People in the Interest of C.M.,* Colo., 630 P.2d 593 (1981). The vice of a vague law, in short, is that it denies procedural due process guaranteed by *U.S.Const.,* amend. XIV to those against whom it is enforced. Although vague laws, when they "abut upon sensitive areas of basic First Amendment freedoms" are also frequently overbroad because "uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zones' . . . than if the boundaries of the forbidden areas were clearly marked," *Grayned v. City of Rockford, supra,* 408 U.S. at 109, 92 S.Ct. at 2299, 33 L.Ed.2d at 228, traditional rules of standing have not been commensurately relaxed to permit a litigant to challenge these laws as a denial of due process as well as First Amendment rights of third parties. *See Young v. American Mini-Theaters,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Tribe, American Constitutional Law* (1978) §§ 12–28, 12–29. The imprecision of a vague law as to a third party's right "has little relevance . . . where [a litigant's] conduct falls squarely within the 'hard core' of the statute's proscriptions. . . ." *Broadrick v. Oklahoma, supra,* 413 U.S. at 608, 93 S.Ct. at 2914, 37 L.Ed.2d at 837–38. Therefore, "where the vice is vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague as applied to the litigant's conduct, without regard to its potentially vague applications to others." *Tribe, American Constitutional Law, supra,* § 12–29; *see Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Here, so far as we can ascertain from the record, plaintiffs are all business enterprises whose conventional, on-site commercial advertising signs are in violation of the Code's clearly and precisely drawn size, height, setback, number and type restrictions. Because plaintiffs' signs fall within the core of the Code's definitional provision, they lack standing to complain that the definitional section, as incorporated by the Code's substantive regulatory provi-

sions, is vague as applied to hypothetical third parties. *See Parker v. Levy, supra; Broadrick v. Oklahoma, supra; People v. Weeks,* 197 Colo. 175, 591 P.2d 91 (1979).

### E.

Plaintiffs also attack the definitional section as an unconstitutional delegation to administrative authorities of the legislature's exclusive power to make or define a law. *See People v. Willson,* 187 Colo. 141, 528 P.2d 1315 (1974). The standing principles which compel us to dismiss plaintiffs' vagueness challenge compel the dismissal of this claim for relief. Under *Wimberly v. Ettenberg, supra,* and its progeny, standing to attack the validity of a law inures only to persons who have suffered an actual or threatened injury to a protected legal interest resulting from the alleged infirmity. Here, while separation of powers principles, *see People v. Willson, supra,* and perhaps, the Fourteenth Amendment, *see Trailridge Ford, Inc. v. Colorado Dealer Licensing Board,* 190 Colo. 82, 543 P.2d 1245 (1975), protect the plaintiffs against prosecutions for "violations of a standard whose meaning is dependent upon surmise or conjecture or uncontrolled application by the [official's] imposing the penalty," *id.,* 190 Colo. at 84, 543 P.2d at 1246, there is no evidence in the record before us that plaintiffs have sustained or risk any such injury as a result of arbitrary or capricious administrative interpretations of the definitional section. Their conventional commercial advertising signs are clearly "signs" within the commonly accepted meaning of that expression and are hence plainly within the ambit of the legislative intent. That they have been cited for violating size, number, setback and other precisely drawn substantive Code provisions incorporating the definitional section does not entitle plaintiffs to attack the section's definition of "sign" as a virtually limitless delegation of power to the executive branch.[10] Enforcement of these sub-

---

10. There is evidence in the record that a setback requirement, omitted from the Code, has been enforced against certain plaintiffs whose businesses are located in C-1 zoning districts.

Although this apparent administrative abuse of power may be challenged in an appropriate proceeding, it cannot credibly be characterized as an injury entitling the plaintiffs to challenge

stantive restrictions against plaintiffs' signs does not evidence "delegation running riot. . . ." *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553, 55 S.Ct. 837, 853, 79 L.Ed. 1570, 1592 (1935) (Cardozo, J., concurring), and therefore falls short of the actual or threatened injury necessary to confer standing to challenge the definitional section as an unconstitutional delegation of legislative power. *See Wimberly v. Ettenberg, supra; Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, Colo., 620 P.2d 1051 (1980).[11]

## II.

Plaintiffs also challenge as overbroad those provisions of the Code which regulate

as standardless the definition of "sign" in the definitional section. There is no causal nexus between the defect complained of—a "virtually limitless" definition of "sign"—and the injury incurred—enforcement of a non-existent setback regulation against conventional signs. *See Duke Power Company v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1976).

**11.** The same principles compel us to reject the trial court's decision holding that sections 3–3(f)(1)(g) and (f)(5)(c) [concerning permitted illumination and plan review criteria] are unconstitutional delegations of legislative power. Plaintiffs lack standing to challenge these provisions.

**12.** Section 3–3(B)(19) is the definition of political sign. It provides:

"*Political Sign.* A sign advertising or promoting a candidate, political party, ballot issue or political issue to be voted upon in any public election."

Section 3–3(C)(8) exempts certain political signs from the permit requirement and provides that:

"*Political Signs.* Signs concerning candidates and/or issues to be considered at a public election shall meet the following requirements:
(a) Shall not exceed four (4) square feet in area;
(b) Shall not be posted more than forty-five (45) days prior to the election for which such signs are erected and shall be removed within fifteen (15) days after said election;
(c) Shall be set back ten feet (10′) from all boundary lines of the lot upon which a sign is located, provided that a clear area is maintained to a height of seventy-two inches (72″) within fifty-five [feet] (55′) of

sign content. Because our analysis turns, in part, on the character of the speech regulated, we will consider each provision separately.

## A.

Sections 3–3(B)(19), (C)(8) and (E)(2) comprehensively regulate the content, time, place and manner of "political" signs.[12] The messages conveyed by "political" signs must concern only candidates and issues to be considered at an upcoming election. The signs must be posted no earlier than 45 days preceding an election and removed no later than 15 days following the contest. All such signs are forbidden in residential, agricultural and conservation districts and may

the intersection of two streets, a railroad and a street, and a street and a driveway;
(d) Shall not be posted or erected on any property owned by a public utility in any public right-of-way, or on any public property;
(e) Shall not be erected or maintained along any street or highway in a Residential, Agricultural or Conservation Zone; and
(f) Notwithstanding any other provision of this Section 3–3, political signs may be printed, painted upon or attached to motor vehicles during the time period provided in Section C(8)(b)."

Section 3–3(E)(2) allows political signs, other than those pertaining to a candidate or an issue to be considered at a public election, in all zone districts, subject to a permit:

"*Political Signs.* Political signs are limited to wall signs and temporary signs whose frames extend into the ground. Such signs shall not exceed thirty-two (32) square feet in face area in any instance. Political signs shall not be posted more than twelve feet (12′) above grade and shall be at least ten feet (10′) from the lot line, provided that a clear area be maintained to a height of seventy-two inches (72″) within fifty-five feet (55′) of the intersection of two streets, the intersection of a street and a railroad, or the intersection of a street and a driveway. Political signs shall not be illuminated or animated. Political signs shall not be erected more than forty-five (45) days prior to the election to which the signs relate and shall be removed by the person or persons erecting or causing the signs to be erected no more than fifteen (15) days after the election to which the signs relate; provided, however, no person shall erect or maintain any type of advertising device intended to promote the candidacy or election of any public official along any street or highway in a Residential, Agricultural or Conservation Zone."

not be posted in public rights of way or on property belonging to public utilities. In addition, depending on their size, political signs may be exempted from the Code's sign permit regulation. All political signs are subject to certain set-back and height restrictions.

The trial court concluded and Lakewood concedes that several of these restrictions are unconstitutional. However, before addressing the merits of that claim and concession, we must first ascertain whether plaintiffs, who have neither erected nor plan to erect political signs, have standing to challenge sections 3–3(B)(19), (C)(8) and (E)(2) on the ground that they deter protected ideological expression by third persons not before us.

■ Because, among all topics of public debate, ideological issues merit the most solicitous constitutional protection, *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); because content censorship of ideological speech is forbidden under all but the most exceptional circumstances, *see Consolidated Edison Company of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); and because certain of these provisions, if construed together, not only circumscribe the permissible content of "political" signs, but may altogether prohibit ideological signs which bear messages dealing with matters other than upcoming elections, we deem these provisions of the Code substantially overbroad. Plaintiffs therefore have standing to attack their facial validity. *See Broadrick v. Oklahoma, supra; Marco Lounge, Inc. v. City of Federal Heights, supra.*

■ Although ideological expression is subject to reasonable time, place and manner regulations, *see Heffron v. International Society for Krishna Consciousness, Inc.*, —— U.S. ——, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Consolidated Edison Company of New York, Inc. v. Public Service Com-*

*mission of New York, supra; Grayned v. City of Rockford, supra*, few governmental interests—and none advanced in this case—are sufficiently weighty to justify restrictions on the content of ideological speech. *See Metromedia, Inc. v. City of San Diego*, —— U.S. ——, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Tribe, American Constitutional Law, supra*, § 12–8 ("The autonomy of the individual and of the press from government's content-based restrictions is thus nearly absolute."). Government may not set the agenda for public debate. Thus, insofar as the above-cited provisions confine the permissible messages borne by "political" signs to information or advocacy concerning electoral issues and candidates, the provisions are unconstitutional. It follows that the constitutional infirmity of the provisions is pervasive and irremediable to the extent that they may be construed to prohibit all ideological signs pertaining to matters other than those under consideration at an upcoming election. *See Metromedia, Inc. v. City of San Diego, supra; Consolidated Edison Company of New York v. Public Service Commission of New York, supra; Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). *See also Schad v. Borough of Mount Ephraim*, —— U.S. ——, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).[13]

### B.

It is, moreover, questionable whether government, under the guise of time, place and manner regulations, may so severely curtail the opportunity for ideological expression as has Lakewood in the present case. *See Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir. 1976), *cert. denied sub nom. Leipzig v. Baldwin*, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *State v. Miller*, 83 N.J. 402, 416 A.2d 821 (1980). To pass constitutional muster, time, place and manner regulations must "serve a significant governmental interest and leave ample

---

**13.** That other fora exist for the dissemination of ideological views is immaterial to the constitutional validity of a law which censors the content of protected expression. *See Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

alternative channels for communication." *Consolidated Edison Company of New York, Inc. v. Public Service Commission of New York, supra; see Heffron v. Society for Krishna Consciousness, supra; Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, Inc., supra. See also United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Here, although we do not question the significance of Lakewood's interests in traffic safety and community appearance, the durational limitations imposed on all ideological signs[14] and the blanket exclusion of such signs from residential, agricultural and conservation districts sweep too broadly. Ample alternative channels of communication are not available to convey ideological beliefs generally and, more specifically, political messages about upcoming electoral contests.

■ Whether more narrowly drawn durational and place regulations may be constitutionally valid is a question for another day.[15] However, we find nothing objectionable in the provisions which merely purport to limit the size, type and set-back of signs conveying ideological messages. These neutral restrictions which are narrowly drawn to promote the City's traffic safety and aesthetic interests impose only an incidental burden on First Amendment freedoms. *See United States v. O'Brien, supra; Veterans of Foreign Wars v. City of Steamboat Springs, supra.*

14. Because temporary signs as defined by section 3–3(B)(31) of the Code are totally forbidden within Lakewood city limits by section 3–3(D), the durational restrictions here apply to permanent signs.

15. We express no opinion on the constitutionality of a regulation which simply requires that signs which pertain to an upcoming election may be posted no more than 45 days in advance of and must be removed no later than 15 days after the contest. However, we can conceive of no permissible regulation limiting the time during which other ideological messages may be displayed.

Moreover, having invalidated the flat prohibition on the display of political signs in residential, agricultural and conservation zones, we need not now address the constitutionality of

## III.

### A.

Sections 3–3(F)(1)(b), (F)(2)(b) and (F)(3)(b) of the Code[16] specify the information which may be communicated by signs located in different zoning districts throughout Lakewood. Because, as drafted, these provisions appear to apply only to commercial speech and because we have held that government regulation of the content of ideological speech, absent extraordinary circumstances not present here, is unconstitutional, we construe these provisions of the Code to regulate only commercial, on-site advertising signs. So construed, we need not—and may not, *see Bates v. Arizona State Bar, supra*—decide whether sections 3–3(F)(1)(b), (F)(2)(b) and (F)(3)(b) are overbroad. Rather, the question is whether Lakewood may constitutionally apply these Code provisions to the plaintiffs themselves, i. e., whether Lakewood may restrict the content of the plaintiffs' on-site commercial advertising signs to identification of a legal use of the lot upon which the sign is located, stating the name, telephone number, location of the use upon the lot, hours of operation, events and public service announcements, services and products offered, and, in some, but not all, commercially zoned districts, the prices of such products and services.[17]

■ Although commercial speech is entitled to First Amendment protection, the

regulations prescribing the number and size of such signs which may be erected on any one lot. *See Baldwin v. Redwood City, supra; State v. Miller, supra.*

16. Sections 3–3(F)(1)(b), (2)(b) and (3)(b) are identical. They list the contents allowed on signs subject to permit in specific zone districts:

"Identification by letter, numeral symbol or design of a legal use stating the name, telephone number, location of the use upon the lot, hours of operation, services offered, events, public service announcements, products offered and prices on products and/or services."

17. Plaintiffs have standing to challenge these sections of the Code as applied to them.

United States Supreme Court has in recent years held that the Constitution, taking into account "common-sense differences between commercial and ideological speech, accords the former less protection than the latter." *Metromedia, Inc. v. City of San Diego, supra; Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra.* Because of its less exalted status and greater durability, the content of commercial speech may be regulated to a greater extent than the content of other types of protected expression. *See Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra; Ohralick v. Ohio State Bar Association, supra.* Governmental regulation of the content of commercial speech will be sustained if it satisfies a four-part test:

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision it at least must concern lawful activity and not be misleading. Next we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted and whether it is not more extensive than is necessary to serve that interest."

*Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. *Accord, May v. People, supra.*

■ While it is not clear in this case precisely what sign messages are forbidden by sections 3–3(F)(1)(b), (F)(2)(b) and (F)(3)(b) (with the exception of advertisements of the prices of products and services which are permitted only in some zones and prohibited in others), this information undeniably is protected by the First Amendment. Furthermore, although Lakewood's

interests in traffic safety and community aesthetics are substantial, *see Metromedia, Inc. v. City of San Diego, supra; John Donnelly and Sons v. Campbell,* 639 F.2d 6 (1st Cir. 1980); *State v. Miller, supra; Metromedia, Inc. v. City of San Diego,* 26 Cal.3d 848, 610 P.2d 407, 164 Cal.Rptr. 510, *rev'd on other grounds, Metromedia, Inc. v. City of San Diego, supra; Stuckey's Stores, Inc. v. O'Cheskey,* 93 N.M. 312, 600 P.2d 258 (1979); *Newman Signs, Inc. v. Hjelle,* 268 N.W.2d 741 (N.D. 1978); *Williams v. City and County of Denver, supra; Veterans of Foreign Wars v. City of Steamboat Springs, supra,* it is far from certain that those interests are directly advanced by these regulations or that the regulations are not more extensive than necessary to promote Lakewood's interests. As the trial court observed, it is difficult to understand why price advertising or help wanted signs pose a greater threat to traffic safety or community appearance than a sign on a soda fountain imploring the passerby to buy Coca-Cola. *See John Donnelly and Sons v. Campbell, supra.* We conclude that the relationship between the content regulations imposed on commercial advertising by sections 3–3(F)(1)(b), (F)(2)(b), and (F)(3)(b) and Lakewood's safety and aesthetic purposes is too attenuated to justify the resulting infringement of First Amendment freedoms. *See Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra; John Donnelly and Sons v. Campbell, supra.* Therefore, these Code provisions are invalid as applied to on-site commercial advertising in the relevant zoning districts.

### B.

■ Similar problems are posed by section 3–3(J)(1)(g) which forbids any changes in the message conveyed by a nonconforming sign.[18] While it is possible that

18. Plaintiffs allege that another provision of the code, section 3–3–(G)(2), which requires that a permit be obtained before a sign may be "altered," also involves government control over sign messages. Although under some circumstances public expression may be regulated by

a narrowly drawn governmental licensing scheme, *see Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), the viability of any legislation which predicates eligibility for a license or permit on the content of the message sought to be conveyed is highly

this provision could be sustained as applied to commercial speech, *see Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra,* Lakewood adduced no evidence that the ban advances its aesthetic or traffic safety interests. When a zoning ordinance impinges on fundamental values, including those protected by the First Amendment, we may not presume that it is constitutional, but must assess the substantiality of the interests advanced to justify the regulation and ensure that it is narrowly drawn to serve those interests. *See Schad v. Borough of Mount Ephraim, supra. Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Rademan v. City and County of Denver,* 186 Colo. 250, 526 P.2d 1325 (1974). The burden is on the municipality to affirmatively advance a substantial interest justifying each provision of its zoning ordinance which demonstrably impinges on First Amendment freedoms. *See Heffron v. International Society for Krishna Consciousness, supra* (Brenann, J. dissenting); *May v. People, supra.* Where, as here, a municipality defaults in this obligation, and the purpose of the provisions cannot be readily deduced from their face, we may not speculate as to the legislative intent. Under these circumstances the zoning regulations must be invalidated as unconstitutional.

questionable. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *see also Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Therefore, in conformity with our duty to construe an ambiguous ordinance consistently with the Constitution whenever such a construction is reasonable and practical, *see Colorado State Board of Medical Examiners v. Jorgensen,* Colo., 599 P.2d 869 (1979), we do not read "alter" to connote a change in the information conveyed by a sign. Rather, we adopt the most logical and constitutionally sound construction of this provision: a permit must be obtained before the *physical characteristics* of a sign are modified in any way. So construed, the provision is constitutional.

**19.** Section 3–3(F)(6) provides
"*Benches Bearing Advertising*

## C.

Section 3–3(F)(6) of the Code prohibits the advertisement of alcoholic beverages, tobacco products and political matters on bus benches located in public rights-of-way.[19] Lakewood attempts to justify this section on the grounds that the benches are tantamount to a limited forum, held by Lakewood for special, proprietary purposes, from which the prohibited messages may be excluded under *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). However, there is no evidence that any members of the plaintiff class have attempted to secure a permit to advertise the forbidden products on bus benches within Lakewood. Since, under *Bates v. State Bar of Arizona,* we may not entertain overbreadth challenges to laws which, arguably, impinge on commercial speech and since the facts supporting standing must be affirmatively demonstrated in the record, *see Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Citizens Concerned for Separation of Church and State v. City and County of Denver,* 628 F.2d 1289 (10th Cir. 1980), we need not now decide whether these facets of the bus bench regulation withstand constitutional scrutiny under *City of Shaker Heights v. Lehman, supra,* and *Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra.*

(a) Subject to the provisions of any existing ordinance regulating occupancy of the public rights-of-way and/or any existing ordinance regulating the placement of bus benches, benches bearing advertising are prohibited from containing advertising for or pertaining to fermented malt beverages, malt, vinous or spirituous liquors, tobacco products, politics, political matters or political personalities.

(b) Advertising Permit: The City Clerk or designated representative shall issue an advertising permit for benches bearing advertising to any person or corporation who has been permitted to place a bench in the public right-of-way pursuant to any existing ordinance regulating occupancy of the public rights-of-way or ordinance regulating the placement of bus benches. An annual permit fee of Ten Dollars ($10.00) per bench is required."

In keeping with our earlier invalidation of the Code provisions regulating the content of political signs, we must address the merits of the ban on political bus bench advertising. In *Lehman v. City of Shaker Heights, supra*, a plurality opinion, Justice Douglas' decisive concurring vote was premised not on the alleged incompatibility between political ads and the limited forum created by the City's commercial venture into transit placard advertising, but on the ads' assault on a "captive audience" of commuters. No captive audience exists in this case. Bus bench advertisements, like any other visual message displayed on a public street, may be avoided simply by averting one's eyes. *See Erzoznick v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Lakewood has not persuasively demonstrated that advertisements of an ideological or political nature are incompatible with the limited purposes of this forum. As far as can be ascertained from the record, the only municipal purpose furthered by permitting advertising on bus benches placed in public ways is that of raising revenue. *See* section 3–3(F)(6)(b) of the Code. Permitting political advertising will not impede Lakewood's revenue raising. *Cf. Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). It cannot be assumed that the bus bench display of ideological messages, together with commercial messages, will suggest to passers-by that Lakewood impermissibly has lent its support to some political candidate or taken sides on a controversial issue. *But see Lehman v. City of Shaker Heights, supra* (plurality opinion).

Moreover, although the issue was not settled by the plurality opinion in *Metromedia, Inc. v. City of San Diego, supra*, it is questionable whether a public entity may "invert" traditional First Amendment values by according greater protection to commercial than to non-commercial expression—at least in the absence of an irreconcilable conflict between the limited purpose for which a semi-public forum is used and the content of the prohibited category of ideological speech. Section 3–3(F)(6) is unconstitutional insofar as it prohibits advertisements of political or other ideological messages on bus benches. *See also John Donnelly and Sons v. Campbell, supra.*

## IV.

In addition to challenging the Code as unconstitutionally overbroad, the plaintiffs also contend—and the trial court held—that it violates the equal protection clause of the Fourteenth Amendment because, by excluding certain specific categories of speech from the definition of "sign," section 3–3(B)(23)(a–e); by excluding other categories of speech from the sign permit provisions of the Code, section 3–3(C); and by permitting political signs to be posted in all zoning districts (save residential, agricultural and conservation districts), section 3–3(E)(2), Lakewood has discriminated against certain classes of messages while according more favorable treatment to others.

Under the First and Fourteenth Amendments, government may not set with impunity the agenda for public debate by extending preferential treatment to the dissemination of views on some topics while denying other persons a forum for the expression of less favored or more controversial beliefs. *See Carey v. Brown, supra; Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Here, plaintiffs argue, the exclusions and exemptions incorporated in sections 3–3(B)(23) and (C)(1–13)[20] run afoul of that prohibition. However, *Carey v. Brown, supra*, and *Police Department of Chicago v. Mosley, supra*, furnish only a point of departure for inquiry—for, in the

---

**20.** Section (C)(1–13) exempts the following categories of signs from the Code's permit requirements (although these signs remain subject to certain size, height and set-back requirements): Bulletin Boards; Cautionary or Warning Signs; Contractor Signs; Grand Openings; Holiday Decorations; Memorial Signs; Religious Symbols; Occupant Signs; Political Signs; Professional; Public Signs; Real Estate; Signs within Buildings, Enclosed Malls or other Enclosures; Sandwich Boards and Hand-Held Signs.

present case, the exemptions and exclusions not only include instances of both commercial and ideological expression, but accord preferential treatment to widely divergent, content-differentiated subcategories of both classes of expression.

### A.

██ At the outset we again note that government may acknowledge the common sense differences between commercial and noncommercial speech and subject the former to more pervasive or far-reaching regulation than constitutionally could be imposed on the latter. *See Central Hudson Gas and Electric Corp. v. Public Service Commission of New York, supra; Ohralick v. Ohio State Bar Association, supra; Young v. American Minitheaters, supra.* Preferential treatment accorded ideological speech does not *per se* deny commercial advertisers equal protection of the law. *See John Donnelly and Sons v. Campbell, supra.* However, under the Equal Protection clause, any distinction Lakewood draws between commercial speech and ideological speech must bear a reasonable relationship to legitimate governmental interests. Plaintiffs contend and the trial court held that the exclusions and exemptions pertaining to ideological speech in the Code cannot be so justified because the lesser regulatory burden imposed on ideological speech renders the Code fatally under-inclusive as a traffic safety and aesthetic measure. We reject that contention.

██ Lakewood constitutionally may place a higher value on ideological expression than it places on offers or inducements to enter into commercial transactions. Commercial speech is entitled to constitutional protection solely because of society's substantial but particularized interest in the information it conveys to consumers concerning goods and services. *See Virginia State Board of Pharmacy v. Virginia Citizens' Consumer Council, supra.* Ideological speech promotes a far broader array of societal interest. Freedom of ideological expression is not only inextricably entwined

with our most deeply held individual values, *see First National Bank of Boston v. Belloti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *see also Cohen v. California, supra,* it is the cornerstone of a constitutional democracy. Therefore, those provisions of the Code which exempt political signs—as we have construed "political" to mean all signs conveying ideological messages [21]—from all or some of the regulations applicable to otherwise identical commercial signs, *e. g.,* sections 3–3(C)(8) and (E)(2), cannot be invalidated as irrational or fatally underinclusive. Rather, they reflect a reasonable and narrowly drawn accommodation of Lakewood's traffic safety and aesthetic interests with its overriding interest in the freest possible dissemination of ideological messages.

### B.

██ A conceptually distinct problem is posed by those provisions of the Code which extend preferential treatment only to certain subcategories of commercial expression—*e. g.,* contractor signs and real estate "for sale" signs. The question is whether Lakewood may value some commercial messages more highly than others. While such choices would be impermissible in an ideological context, the United States Supreme Court has approved them within the realm of purely commercial speech. In *Metromedia, Inc. v. City of San Diego, supra,* five Justices concluded that a municipality could constitutionally prohibit off-site commercial billboard advertising while permitting businesses to display on-site advertising signs identifying their establishments and touting the products and services sold there:

> "San Diego has obviously chosen to value one kind of commercial speech—on-site advertising—more than another kind of commercial speech—off-site advertising.... We do not reject that judgment. As we see it the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its

---

21. *See* section II, *supra.*

place of business and advertising the products and services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. . . . It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context [in traffic safety and aesthetics] that it must give similar weight to all other commercial advertising."

*Metromedia, Inc. v. City of San Diego, supra,* —— U.S. at ——, 101 S.Ct. at 2894–95 (1981).

While the distinction drawn by the San Diego law between on-site and off-site advertising could be characterized as a content-based classification in view of the content restrictions imposed on on-site signs, it is so to a considerably lesser degree than the highly specific content-based distinctions drawn by the Lakewood Code. The Lakewood Code, for example, distinguishes on-site commercial signs in general from real estate "for sale" signs, from signs naming the contractor, financing agency and realtor engaged in the construction of a building or facility, from "grand opening" advertisements, from "professional signs," *etc.* Consequently, the Code raises issues more closely related to those in *Central Hudson Gas and Electric Corp. v. New York Public Service Commission, supra,* than in *Metromedia, Inc. v. City of San Diego, supra.* See *Metromedia, Inc. v. City of San Diego, supra,* —— U.S. at ——, n.12, 101 S.Ct. at 2906, n.12 (1981) (Brennan, J. concurring in the judgment).

Under the *Central Hudson* four-part test, Lakewood must demonstrate that the content-based distinctions it has drawn are carefully tailored to directly advance substantial governmental interests. *Central Hudson Gas and Electric Corp. v. New York Public Service Commission, supra; Carey v. Brown, supra.* It is not clear that each content-based distinction in the Code meets

this demanding standard. For example, although real estate "for sale" or garage sale signs legitimately may be exempted from the permit and concomitant regulatory provisions of the Code on the basis of a legislative judgment that their unique utility as a medium of communicating sales information to prospective buyers, *see Linmark v. Township of Willingboro, supra,* outweighs the traffic safety and aesthetic interests promoted by the more burdensome regulations to which other on-site commercial advertising signs must conform,[22] it is hardly certain that similar substantial interests are promoted by the exemptions granted to "contractor" or "grand opening" signs. Our uncertainty whether the content-based distinctions pertaining to commercial speech would survive scrutiny under *Central Hudson Gas and Electric Corp. v. New York Public Service Commission, supra,* is exacerbated by Lakewood's failure to identify and explain the specific interests served by individual exclusions and exemptions. Because we cannot *sua sponte* identify and assess the substantiality of the legislative purposes underlying each of the pertinent subsections of sections 3–3(B)(23) and (C), we have no alternative but to hold that the provisions preferring some types of commercial speech over others, with the exception of subsections 3–3(C)(11) and (12), are unconstitutional. *See May v. People, supra.*

### C.

◼ A third problem is posed by the exemptions and exclusions which, on their face, accord preferential treatment to some content-identified subcategories of ideological speech. Here, again, we confront a threshold standing issue. Although the speech disfavored by the relevant exemptions and exclusions set out in sections 3–3(B)(23) and (C) is noncommercial, allowing a facial overbreadth challenge to those provisions, *cf. Bates v. Arizona State Bar, supra,* we must nevertheless decide whether the exemptions and exclusions, if over-

---

**22.** Similarly, the exemption granted to signs within buildings by section 3–3(C)(12) of the Code is easily justified by such signs' insub-

stantial impact on municipal traffic safety and aesthetic objectives.

broad, are so substantially overbroad that the plaintiffs, commercial advertisers whose constitutional freedoms are not infringed by these provisions, may champion the rights of third persons allegedly victimized by the discriminatory classifications. In view of the protection afforded ideological speech, *see Carey v. Brown, supra; Police Department of Chicago v. Mosley, supra,* we conclude that any plainly legitimate sweep of these provisions pales in comparison with the express and arguably unconstitutional burden they impose on protected, noncommercial expression. We therefore address the merits of the constitutional issue raised by the plaintiffs. *See Broadrick v. Oklahoma, supra; Marco Lounge, Inc. v. City of Federal Heights, supra.*

██ A vice of these provisions is that they submit different subcategories of ideological expression, identified by content, to different degrees of regulation. Several such subcategories—including the flags of nations, states, cities and fraternal, religious and civic organizations; national, state, religious, fraternal and civic symbols and crests; scoreboards on athletic fields and, in several locations, announcements of charitable and public service functions—are excluded from the definition of sign and thus unregulated. Others, although exempted from the Code's sign permit provisions, are subject to specific height, size, set-back and durational restrictions. These include bulletin boards, cautionary warning signs, holiday decorations, some memorial signs, some religious symbols, occupant signs and some "political" signs. Still other larger "political" signs may not be erected or posted without a permit.

When it recently invalidated a similar content-based distinction which permitted some ideological signs while forbidding others, a plurality of the United States Supreme Court held that "with respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse." *Metromedia, Inc. v. City of San Diego, supra. See Consolidated Edison Company of New York, Inc. v. Public Service Commission of New York, supra.*

However, the Court divided on the question whether and under what circumstances such *"de minimus"* content-based distinctions could be drawn by a municipal sign ordinance. Lacking authoritative precedent, we adopt one view in *Metromedia* to

"allow an exception only if it directly furthers an interest that is at least as important as the interest underlying the ... ban, if the exception is no broader than necessary to advance the special goal and if the exception is narrowly drawn so as to impinge as little as possible on the overall goal. To the extent that exceptions rely on content-based distinctions, they must be scrutinized with special care."

*Id.,* ── U.S. at ──, 101 S.Ct. at 2905, 69 L.Ed.2d at 830, n.10 (Brennan, J. concurring in the judgment). This analysis is supported also by dictum in *Carey v. Brown, supra,* that "certain state interests may be so compelling that where no adequate alternatives exist a content-based distinction—if narrowly drawn—would be a permissible way of furthering those objectives." *See John Donnelly and Sons v. Campbell, supra.*

Lakewood's attempt at minimizing the regulatory burden on specified subcategories of ideological signs while more comprehensively regulating commercial signs is constitutionally unobjectionable. Moreover, because we have invalidated many of the "political" sign regulations, it cannot be argued here, as it was in *Metromedia, Inc. v. City of San Diego, supra,* that any single type of ideological sign is prohibited by the Code. Thus, the remaining question is whether the few subcategories of ideological signs altogether exempted from regulation in the definition section can be preferred over the subcategories of ideological signs subject to the lenient provisions of section 3–3(C). We conclude that they may not.

While the exclusion, *e. g.,* of announcements of charitable or public service events from the definition of "sign" may be justified, we perceive no substantial special goal which might justify the exemption of, *e. g.,* fraternal organizations' symbols, crests and

flags or religious symbols, crests and flags from the height, size and set-back requirements for those signs which section 3–3(C) regulates, and Lakewood has not articulated a justification for this preferential treatment. The flaw in the Code is not that it has enacted such restrictions but that, without a plain and cogent justification, it has exempted several types of ideological expression from the place and manner regulations required for other ideological signs. Therefore, we hold that the above-cited provisions of the Code are unconstitutional.[23]

## V.

The plaintiffs also argue, and the trial court held, that Lakewood lacks the power to regulate the number and type (e. g., "roof," "wall," "ground") of signs permitted on lots in various zoning districts within its boundaries. This argument is without merit. Although Lakewood, unlike Steamboat Springs and Denver, is a statutory city, the powers granted to it by sections 31–23–301(1), C.R.S.1973 (1977 Repl. Vol. 12), and section 31–15–103, C.R.S.1973 (1977 Repl. Vol. 12), are commodious enough to enable Lakewood to promote its safety and aesthetic interests by regulating the number and type of signs permitted in different zoning districts. See Williams v. City and County of Denver, supra; Veterans of Foreign Wars v. City of Steamboat Springs, supra. The plaintiffs' contention that several provisions of the Code are internally inconsistent and contradictory is also without merit.

## VI.

Because the Code contains a severability clause,[24] Lakewood urges us to sever

from the remainder of the Code those provisions we find unconstitutional. As a general rule, if a statute or ordinance is constitutional in one part and unconstitutional in another, the constitutional provision may be sustained and the unconstitutional stricken. See Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Israel v. Allen, 195 Colo. 263, 577 P.2d 762 (1978); Greeley Police Union v. City Council of Greeley, 191 Colo. 419, 553 P.2d 790 (1976). Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body.

A severability clause such as section 3–3(J)(4) "discloses a legislative intention to make the act divisible, and creates a presumption that, eliminating invalid parts, the Legislature would have been satisfied with what remained." Champlin Refining Company v. Corporation Commission, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062, 1078 (1932). However, the declaration of legislative intent gives rise only to a presumption that the legislature would have been satisfied with what remained—a presumption which is dispelled if what remains is so incomplete or riddled with omissions that it cannot be "salvag[ed] . . . as a meaningful legislative enactment." Pierce v. City and County of Denver, 193 Colo. 347, 352, 565 P.2d 1337, 1340 (1977).

We reluctantly conclude that the Code's defects are so pervasive that it must be invalidated in its entirety. We perceive no means to rectify the discrimina-

---

**23.** We cannot exempt all ideological signs from the Code's definition of sign; to do so would frustrate Lakewood's efforts to eliminate safety hazards and improve community appearance. Alternatively, we cannot judicially legislate the height, size and set-back regulations which would apply to flags, crests and symbols were they to be treated as section 3–3(C) signs. We must invalidate each of these provisions on its face.

**24.** Section 3–3(J)(4) is the severability provision:

"If for any reason, any one or more sections, sentences, clauses or parts of the Sign Code are held invalid, such judgment shall not affect, impair or invalidate the remaining portions of this Sign Code, but shall be confined in its operation to the specific sections, clauses or parts of this ordinance held invalid. The invalidity of any section, sentence, clause or part of this ordinance in any one or more instances shall not affect or prejudice in any way the validity of this Sign Code in any other instance."

tory distinctions the Code draws between different subcategories of ideological and commercial speech. The choice of reasonable, neutral time, place and manner regulation of ideological signs or exemption of such signs from all regulation [25] is one within the legislative prerogatives of the Lakewood City Council. It is also within the Council's sole discretion, should it decide that certain subcategories of commercial expression ought to be less stringently regulated than others, to adopt narrowly drawn, content-based regulations implementing its value judgment that society's interests in the preferred forms of commercial expression outweigh municipal traffic safety and aesthetic interests.

<div align="center">VII.</div>

Judgment affirmed.

</div>

---

**25.** A reasonable ordinance exempting ideological but not commercial signs from regulation is constitutional. *See Metromedia, Inc. v. City of San Diego, supra,* —— U.S. at ——, n.26, 101 S.Ct. at 2899, n.26, 69 L.Ed.2d at 823, n.26; *May v. People, supra.*